No. 84,112

STATE OF KANSAS, *Appellee*, v. BRIAN BETTS, *Appellant*.

(33 P.3d 575)

Opinion filed October 26, 2001.

*David A. Kelly* and *Cheryl A. Pilate*, of Wyrsch Hobbs & Mirakian, P.C., of Kansas City, Missouri, argued the cause and were on the briefs for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Brian Betts appeals from his conviction of premeditated first-degree murder in the death of Greg Miller. He contends (1) the trial court erred in denying his motion for a new trial following the recantation of the primary witness against him, (2) the court erred in admitting evidence in certain hearsay testimony, (3) the prosecutor committed misconduct during closing arguments, (4) the court erred in denying him a continuance after the revelation of exculpatory evidence requiring further investigation, (5) the prosecutor knowingly presented perjured testimony, (6) the court erred in denying his motion for new trial based on ineffective assistance of counsel, (7) the trial court failed to follow the proper procedure in answering questions posed by the jury, and (8) the court erred in overruling his objection to the prosecutor's peremp-

tory strikes of jury members. Finding no reversible error, we affirm.

Brian Betts, Celester McKinney, and Celester's brother, Dwayne McKinney, were all charged with the first-degree premeditated murder of Greg Miller. Based upon a pretrial motion to sever, the defendant and the McKinney brothers were granted separate trials. Defendant Betts was found guilty, and we deal with his appeal in this case. Celester McKinney was also found guilty, and on appeal his conviction was affirmed by this court in *State v. McKinney*, No. 83,217, filed this date. Dwayne McKinney was found not guilty.

The major players involved in this appeal are Brian Betts and Celester and Dwayne McKinney. The main witness for the prosecution was Carter Betts, who is the uncle of the three codefendants. Jimmy Spencer, Jr., uncle of the victim, also testified on the part of the State. Other witnesses who testified at trial are identified below.

In the early morning hours of December 29, 1997, police in Kansas City, Kansas, responded to a report of shots fired and found Greg Miller's body. Greg had been shot 18 times with both a shotgun and a rifle. A trail of blood ran to the body. Spent 12-gauge shotgun shells and empty rifle shell casings were found near the body.

Alfred Burdette, Jr., the person who reported the shots, testified he heard the gunshots at approximately 3 a.m. He looked outside and saw a person walking and firing a gun. Another person on the other side of the street was also firing. At first, Burdette thought the persons were shooting at each other, but then he noticed they both ran off together in the same direction. Burdette testified at trial that he saw one of the shooters enter the rear gate at 2917 N. 5th. The person went to the door, hesitated, and then went in. Officer Keto Thompson was one of the responding officers. Officer Thompson testified that he talked to Burdette. According to Officer Thompson, Burdette said the person went between the houses, but Burdette did not know whether the person had actually entered the house in question.

Brian Betts resided at 2119 N. 5th with his uncle, Carter Betts. The defendant lived in an apartment at the residence with a separate entrance, while Carter, Celester McKinney, and Dwayne McKinney lived in the main part of the house.

Carter provided the testimony linking the defendant to the crime. Celester and Dwayne were cleaning a building on the night in question and returned home between 11:30 p.m. and midnight. Carter went to sleep but was awakened at approximately 3 a.m. by gunshots. He testified he then heard the front door open and close. He went downstairs to investigate and found the defendant, Dwayne, and Celester. A pistol grip shotgun and an assault rifle lay at the feet of Dwayne and the defendant.

According to Carter, he asked what happened and Celester replied that they "shot that Greg cat." Carter stated that Celester did most of the explaining, although the defendant and Dwayne also interjected comments. Celester explained to Carter that they suspected Greg, the victim, broke into and burglarized the defendant's apartment. Celester stated the defendant and Dwayne were looking for Greg but could not find him, so Celester went to his house to urge him to come out. When Greg denied having broken into the defendant's apartment, Dwayne raised a gun to shoot him. However, the gun jammed and Greg began to run away. Celester told Dwayne and the defendant to stop him because they could not let him live to be a witness. Dwayne and the defendant began firing and their shots knocked Greg down. Celester told Carter that the defendant then went over and finished Greg off. According to Carter, the defendant also confirmed that he stood over Greg and shot him. Carter testified the defendant later told him they had gotten rid of the guns.

Carter testified that when the police questioned him regarding the incident, he told them his nephews had been in bed asleep at the time the shots were fired. Later, however, the police questioned him at the station and he changed his story. Carter stated that his family was split over his testifying against his nephews. Near the end of the testimony, he began to cry. Under cross-examination, Carter testified that he and the defendant had a disagreement because the defendant thought Celester had broken into

his apartment and Carter was protecting Celester by telling the defendant that Celester was with him when the break-in occurred. However, according to Carter, the defendant and he had resolved their differences by the time of the shooting.

Jimmy Spencer, Jr., Greg Miller's uncle, also provided information linking the defendant to the crime. Spencer stated that he woke up around 3 a.m. in order to get something to eat, and found that the soda pop that he had put in the refrigerator was gone. He woke Greg, who was living with him, and asked him if he had taken the soda pop. Greg confirmed that he had. Spencer sent Greg out to buy a soda pop from a nearby machine. When Greg returned, he told Spencer that a person named Les wanted to talk to him. Spencer testified he thought Greg was referring to the defendant as Les. Greg left to find out what Les wanted. Spencer stated he heard gunshots a few minutes later. He looked out the window and saw someone shooting toward the ground. Spencer dressed and went to investigate whereupon he found Greg's body. Soon after, the police arrived.

The other evidence linking the Betts' household to the crime came from a member of Greg's family who told police that a person named Les was involved.

The defendant presented an alibi defense. He testified he was asleep in bed with his fiancee and baby son when he heard the shots. The defendant stated he and Carter had many disputes over many things, including the break-in at his apartment, and that he did not associate with Carter, Celester, or Dwayne. The defendant also presented the testimony of his fiancee, who indicated the defendant was in bed when the shooting occurred, and that of his mother, who testified the defendant and Carter had quarreled over the defendant's pay from Carter's cleaning business.

The jury convicted the defendant of premeditated first-degree murder on August 21, 1998. The defendant filed a motion for new trial, arguing that Carter had recanted his trial testimony. The motion also alleged 11 other grounds for a new trial including: (1) the State had violated his constitutional rights by suborning the perjury of Officer Keto Thompson, Spencer, and Carter; (2) the State had failed to provide the defendant with exculpatory evidence including

Carter's retraction and Spencer's criminal record; (3) the court erred in severing the trials of the codefendants; (4) the court had erroneously denied the defendant's *Batson* objection; (5) the court had erred in allowing Carter's hearsay testimony; (6) the prosecutor had committed misconduct in closing argument; (7) the court had not properly instructed the jury as to lesser included offenses; (8) the court had not properly read back testimony to the jury; (9) the court had not properly responded to questions asked by the jury; (10) the defendant was denied effective assistance of counsel; and (11) the verdict was contrary to the evidence and the law.

The district court held a hearing on the motion for a new trial. Carter testified his statement to police was untrue and he did not know anything about the murder of Greg because he was asleep when the shooting occurred. According to Carter, he made up the statements of his nephews because police told him they already knew Celester and Dwayne were involved, and that three persons were seen entering his house following the shooting. Carter thought the police were suspicious that he might be the third person. He also felt pressured by the community and the police. Carter testified that Detective Smith said he would be charged if he did not tell the police what he knew and Smith also informed him as to what guns were used.

Carter testified he later told the police that his statement was untrue but they insisted he testify. He stated that Prosecutor Dan Cahill met with him before the preliminary hearing and instructed him as to what his story should be, as well as what to say to avoid the hearsay rule. When he told Cahill he did not want to testify, Cahill threatened him with prosecution.

The testimony then moved to the defendant's allegation that he had received ineffective assistance of counsel from his trial attorney, Mark Sachse. Sergeant Charles Patrick testified jail records indicated Sachse had made two visits to the defendant between February and September of 1998, one for 15 minutes and another for 25 minutes. Again, the defendant's trial was in August 1998.

Della Betts, the defendant's aunt, stated she had planned to testify on the defendant's behalf at trial but Sachse told her she should not testify because she would be a bad witness due to a bad

check issue. Della stated that she would have testified that Carter told her he had no idea about the shooting and that one of the witnesses, Alfred Burdette, was a drunk. Della testified that she discussed this testimony with Sachse.

Ellen Lenard, the defendant's mother, testified that she visited Sachse approximately six times. She told Sachse of possible witnesses including her own mother, Mary Mitchell; her sister, Norma Jean Meeks; and Della Betts. She stated she pressed Sachse to file a motion for discovery but he told her such a motion was not necessary. She also informed Sachse that Burdette was a drunk.

The defendant testified that he met with Sachse one time prior to his preliminary hearing when Sachse urged him to take a plea. Later, Sachse visited him prior to trial and told him that he did not file a motion for discovery because he did not want to make the district attorney mad. The defendant testified that Sachse visited him the week before trial when Sachse told him to make a list of witnesses he wanted to call.

The defendant stated he wanted Sachse to call his grandmother, Mary Mitchell, to testify regarding problems and lack of affiliation with Carter, Dwayne, and Celester. He wanted to call Della Betts, and also Norma Jean Meeks, who would testify that Carter told her he lied to the police. He wanted to call another aunt, Lori Betts, and also Jesse Brochovich, both of whom would have testified that Carter told her Celester and Dwayne were asleep at the time of the shooting. Further, he wanted to call Detective Golubskie, who is married to the victim's aunt, to testify that he, Golubskie, had leaked certain confidential information to the victim's family. Finally, he wanted to call Andrea Burdette, daughter of Alfred Burdette, to testify that her father was an alcoholic and did not witness the shooting. However, according to the defendant, Sachse stated he did not want anyone to testify on the defendant's behalf.

The defendant testified that he sent Sachse letters on several different occasions, but Sachse did not respond or accept his telephone calls. The defendant also claimed he was unable to talk to Sachse during trial and that Sachse did not prepare him to testify. Sachse never revealed the information in the police report to him,

nor did Sachse explain what his theory of defense would be. He also asked Sachse to investigate the crime scene but Sachse did not do so.

Sachse testified concerning his representation of the defendant. Sachse stated that he had tried approximately 130 jury trials prior to that of the defendant, with the vast majority of those being criminal, including eight murder cases. Sachse noted that he had actually been appointed twice in this case. The first time he managed to get the case dismissed at preliminary hearing. After charges were refiled, the defendant's family hired an attorney, who withdrew prior to trial. Sachse was reappointed.

Sachse stated he met with the defendant three or four times prior to trial and also met several times with the defendant's mother and family members. He also went to the crime scene and after reviewing the scene, decided it was in the defendant's best interest that the crime scene not be fully explained to the jury. With regard to discovery, he stated he was able to review the prosecutor's entire file. Although the defendant's mother pushed him to file a discovery motion, he explained to her that a discovery motion was not necessary because the State's entire file was available to him and provided more information than would be available under a discovery motion. Sachse admitted he did not file any pretrial motions but stated he believed none were necessary. By the time he entered the case for the second time, the case had already been severed from those of the codefendants.

With regard to his trial strategy regarding the calling of witnesses, Sachse stated he felt the key to the defense was to discredit Carter's testimony. Although the family wanted him to call the defendant's grandmother, Mary Mitchell, he discovered she did not want to testify and that she believed Carter was telling the truth. Sachse stated he did not want to call Della Betts because she had a dispute with Carter resulting in criminal charges being filed against her and also had a conviction which involved her veracity. He testified he did not want to put the defendant's aunt, Patricia Betts, on the stand because there was a note in the file that one of her sons, Celester or Dwayne, had called her and admitted being involved in the murder. When asked about a person

named Robert Law, Sachse testified that neither the defendant nor the family told him about Law and, further, that Law would not have been a good witness because he was facing capital murder charges at the time of trial.

Sachse stated he advised the defendant not to testify, although the defendant did so. He also put the defendant's fiancee on the stand at the defendant's insistence, although the defendant had written a letter to her with lyrics from a rap song talking about shooting someone for stealing.

Sachse testified that much of the evidence the defendant's mother wanted him to present would not have been helpful to the case. Because Sachse's theory denied the defendant's involvement and placed the blame on Celester and Dwayne, it was important that Alfred Burdette's testimony be considered credible, as Burdette saw two people, not three, shooting the victim.

Sachse admitted he did not give an opening statement at trial. However, he testified he often does not do so when there is a chance his witnesses will testify differently than he expects.

On cross-examination, Sachse was confronted with the log book which detailed only two visits to the defendant. Sachse stated that he disagreed with the log book, and noted that the keeping of the book by the sheriff's office was done inconsistently. Sachse testified that in his opinion, he communicated sufficiently with the defendant to put on a competent defense. He stated he fully explained his strategy to the defendant.

The trial court ultimately found Carter's recantation was not credible. With regard to the defendant's claim of ineffective assistance of counsel, the trial court held that Sachse's performance was not deficient and that most of the allegations related to trial strategy. The trial court rejected all other arguments of defendant and denied his motion for new trial.

## Denial of New Trial—Recanted Testimony of Carter Betts

Carter's testimony not only linked the defendant to the crime but provided the basis for the defendant's conviction. Without his testimony, there would have been no evidentiary basis for the defendant's murder conviction. After trial, Carter recanted his trial

testimony; thus, Carter provided the defendant with new evidence which, if believed, would leave the State with very little evidence to connect the defendant to the crime. The trial court, following the hearing of the defendant's motion for a new trial, concluded that Carter's recantation was not credible and provided no basis for a new trial.

K.S.A. 22-3501 provides a court may grant a motion for a new trial based on the ground of newly discovered evidence. Two requirements must be met before a trial court will grant a defendant's motion for new trial based upon newly discovered evidence. First, the defendant must establish that the newly proffered evidence is indeed "new," in that it could not, with reasonable diligence, have been produced at trial. Second, the evidence must be of such materiality that there is a reasonable probability that the newly discovered evidence would produce a different result upon retrial. *State v. Moncla*, 269 Kan. 61, 64, 4 P.3d 618 (2000). The granting of a new trial is a matter within the discretion of the trial court. *State v. Reed*, 256 Kan. 547, 560, 886 P.2d 854 (1994).

While the State argues that the recanted testimony of Carter was not newly discovered evidence primarily because the defendant knew Carter's trial testimony was false at the time given, it is clear that until Carter recanted his testimony after trial, the defendant could not have known about the recanted testimony. We conclude that the recanted testimony of Carter was newly discovered and could not, with reasonable diligence, have been produced at trial.

New trials on grounds of newly discovered evidence are not favored and such motions are to be viewed with caution. *State v. Thomas*, 257 Kan. 228, Syl. ¶ 2, 891 P.2d 417 (1995).

The standard applied by the trial court for granting a new trial based on recanted testimony is well established. Where a new trial is sought on the basis of recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial court passing on the motion for a new trial to determine. The trial court is required to grant a new trial only when he or she is satisfied the recantation of the witness' testimony is true and material. Appellate review of an order denying a new trial is limited to whether the

trial court abused its discretion. See *State v. Norman*, 232 Kan. 102, 109, 652 P.2d 683 (1982).

In this case, after a full hearing upon the defendant's motion for a new trial, the trial court determined that Carter's recantation was not credible. The record supports this determination and at the very least fails to support the conclusion that no reasonable person would agree with the trial court's decision. *Shepherd*, 232 Kan. at 619. The defendant fails to establish an abuse of discretion and the trial court's denial of the defendant's motion for new trial stands.

## Perjured Testimony

The defendant claims the prosecutor presented perjured testimony requiring this court to reverse his murder conviction. A conviction obtained by the introduction of perjured testimony violates a defendant's due process rights if (1) the prosecution knowingly solicited the perjured testimony, or (2) the prosecution failed to correct testimony it knew was perjured. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). However, the evidence fails to support a conclusion that perjured testimony was presented at trial. Instead, the trial court concluded with ample evidentiary support that Carter's recantation was not credible and that his trial testimony was credible. Under these circumstances, the defendant fails to establish that the prosecutor presented perjured testimony.

## Hearsay Statements

Carter, over objection, was allowed to testify as to Celester's explanation of the crime. The defendant argues that the admission of the statements under the guise of adoptive admissions violated his due process rights and his rights under the Confrontation Clause of the United States Constitution.

The trial court found Celester's statements to Carter were admissible against the defendant as adoptive admissions under K.S.A. 2000 Supp. 60-460(h)(2). This exception applies to statements "of which the party with knowledge of the content thereof has, by words or other conduct, manifested the party's adoption or belief in its truth." K.S.A. 2000 Supp. 60-460(h)(2). Through this excep-

tion, an incriminating statement of a third person, which an accused has admitted to be true, is admissible in evidence against the accused as his or her own statement by adoption. *State v. Buckner*, 223 Kan. 138, 145, 574 P.2d 918 (1977). This exception also allows the admission, under certain circumstances, of statements to the prejudice of the accused, made in his or her presence, and tolerated without resentment, explanation, or denial by the accused. *Buckner*, 223 Kan. at 145; *State v. Ritson*, 210 Kan. 760, 763-64, 504 P.2d 605 (1972).

The evidence in this case, according to Carter, established that the defendant heard Celester's explanation of the events surrounding the shooting, agreed with it, and interjected several comments. Thus, if Carter's testimony is credible, the defendant "manifested by words or other conduct" his adoption of Celester's statements.

In order for such adoptive silence statements to be admissible, the evidence must disclose that: (1) the statement was extrajudicial, (2) it was incriminatory or accusative in import, (3) it was one to which an innocent person would in the situation and surrounding circumstances naturally respond, (4) it was uttered in the presence and hearing of the accused, (5) the accused was capable of understanding the incriminatory meaning of the statements, (6) the accused had sufficient knowledge of the facts embraced in the statement to reply thereto, and (7) the accused was at liberty to deny it or reply thereto. *Ritson*, 210 Kan. at 763-64. Celester's statements to Carter met each of the above requirements.

The defendant further argues that the trial court's failure to require a showing of particularized guarantees of trustworthiness rendered the hearsay statements and adoptive admissions inadmissible. In *State v. Bratt*, 250 Kan. 264, Syl. ¶ 1, 824 P.2d 983 (1992), based upon the United States Supreme Court's decisions in *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990), and *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 107 S. Ct. 2531 (1980), this court said:

"The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the

defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness."

Thus, the defendant is correct in his argument that the Confrontation Clause can operate to bar admission of evidence and adoptive admissions that would otherwise be admissible under an exception to the hearsay rule if its requirements are not met. See *Bratt*, 250 Kan. at 270. However, the defendant's argument erroneously assumed that the statements as well as the adoptive admissions in this case are not within a "firmly rooted hearsay exception."

More specifically, the defendant argues that absent a determination by the trial court that the statements had adoptive admission by the defendant's conduct and were admissible as being within a "firmly rooted hearsay exception," the trial court was obliged to consider whether the statements bore particularized guarantees of trustworthiness, which it did not do. However, although Kansas has not specifically addressed this question, those states which have done so have concluded that the hearsay exception for adoptive admissions, including admissions by silence, is a firmly rooted hearsay exception. See *State v. Lawson*, 23 Conn. App. 358, 363, 580 A.2d 87 (1990); *Commonwealth v. Babbitt*, 430 Mass. 700, 706-07, 723 N.E.2d 17 (2000); *State v. Marshall*, 113 Wis. 2d 643, 655, 335 N.W.2d 612 (1983). In *Babbitt*, the Massachusetts Supreme Court noted that not only is the exception at least 2 centuries old, but the Federal Rules of Evidence classify adoptive admissions among those statements which do not constitute hearsay at all. 430 Mass. at 707.

We conclude that the hearsay exception under K.S.A. 2000 Supp. 60-460(h)(2) for adoptive admissions, including admissions by silence, is a firmly rooted hearsay exception. Thus, it was not incumbent on the trial court to determine whether the statements bore particularized guarantees of trustworthiness. The statements

were properly admitted into evidence as adoptive admissions under K.S.A. 2000 Supp. 60-460(h)(2).

Prosecutorial Misconduct

The defendant's third contention is that the prosecutor committed misconduct during closing arguments. He contends the prosecutor improperly put words into his mouth during closing argument and violated his rights.

Our standard of review with regard to prosecutorial misconduct is well established. An appellate court's analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court must determine whether the remarks constituted plain error; that is, whether they were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. In order to find that the remarks were not so gross or flagrant, the court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. *State v. McCorkendale*, 267 Kan. 263, 278-79, 979 P.2d 1239 (1999).

"It is the duty of a prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and use every legitimate means to bring about a just conviction, but he should always bear in mind that he is an officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he should preserve. [Citation omitted.]" *State v. Ruff*, 252 Kan. 625, 634, 847 P.2d 1258 (1993).

During closing arguments, the prosecutor stated:

"Think about Carter Betts, think about what he told you, think about whether the defendant's story made sense. Remember what he said. Family's family. *I can tell my Uncle Carter about a murder and I expect him to cover for me.* They attack Carter, is that surprising? It's the only thing they can do." (Emphasis added.)

The defendant did not object to the above statement. Kansas does not ordinarily apply the plain error rule, and reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporane-

ous objection is lodged. However, if the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *McCorkendale*, 267 Kan. at 278.

The defendant did not state he could tell Carter about a murder and expect Carter to cover for him. He implicitly stated he did not think Carter would cover for him if he committed a murder. However, a reading of the statement in context shows that the prosecutor was not alleging the defendant actually said such a thing but, instead, made an inference from the defendant's testimony that "family's family." A prosecutor may draw reasonable inferences from the evidence, although he or she may not comment upon facts outside the evidence. *State v. McCray*, 267 Kan. 339, 351, 979 P.2d 134 (1999).

The defendant argues that if the statement by the prosecutor was unintentional, jurors are not seasoned legal experts and might have believed he did make the statement that his uncle would cover for him. He argues that either way, such a statement was prejudicial.

It is true the prosecutor's statement was not artfully phrased and should have been avoided. However, it is not possible to say that it was outside the wide latitude given prosecutors to argue the evidence. Further, even if it might be considered misconduct, it was not so prejudicial as to affect the defendant's right to a fair trial. The jury heard the defendant's testimony and cross-examination and was cautioned that the prosecutor's statements were not evidence. Under these circumstances, there was no reversible error.

## Failure to Grant a Continuance

The defendant claims the trial court erred in denying him a continuance to investigate allegedly exculpatory evidence. In the middle of the trial, the prosecution notified the defendant's counsel that Jimmy Spencer, uncle of the victim, had been told by his sister that Detective W.K. Smith told Spencer's sister there were three weapons involved in the crime; two automatic rifles and a shotgun.

Defense counsel wanted to cross-examine Spencer regarding this statement but the prosecutor objected on the basis of hearsay. Defense counsel stated the statement would not be hearsay because it would not be presented to show that the guns were used, but would be presented to show knowledge of the types of weapons used were available to members of the public. The purpose would be to counteract any argument that the only way Carter could have known what weapons were used in the shooting was if his nephews told him what weapons they used. A long and convoluted argument followed. Eventually, the court determined that the statement was hearsay and because there was no evidence the information was available to Carter, the statement could not be used. The defendant requested a continuance in order to have an opportunity to interview Detective Smith. However, the court found that Detective Smith was out of town and unavailable. Further, because Spencer's sister denied being told by Smith of the guns used, the motion for continuance was denied.

The defendant contends the continuance should have been granted, citing *Giglio v. United States.*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972). In *Giglio,* the United States Supreme Court held that the suppression of material evidence affecting the credibility of a witness justifies a new trial irrespective of the good faith or bad faith of the prosecution. 405 U.S. at 153-54. The defendant contends the information from Spencer was exculpatory and, therefore, it was error for the trial court to deny a continuance to investigate it.

In a criminal case, the granting or denying of a motion for continuance is within the discretion of the trial court. *State v. Stallings,* 262 Kan. 721, 726, 942 P.2d 11 (1997). Prosecutors have a positive duty to disclose exculpatory evidence to the defendant. *State v. Wilkins,* 269 Kan. 39, 42, 5 P.3d 520 (2000). Where the prosecution fails to disclose exculpatory evidence in a timely manner, the proper remedy is to grant a continuance to allow the defendant time to investigate the evidence. *State v. Nuessen,* 23 Kan. App. 2d 456, 462, 933 P.2d 155 (1997).

The defendant alleges that the evidence in this case was exculpatory because it rebutted the prosecution's assertion that Carter

was telling the truth as he knew what weapons were used and could only have gotten that information from someone associated with the crime such as the defendant. However, the materiality of the evidence is seriously in doubt. The simple fact that a detective might have told a member of the victim's family that certain weapons were used, standing on its own, is insufficient to establish any kind of an inference that the defendant might have been informed of the weapons used. Any investigation by the defendant would necessarily be a fishing expedition to try to establish a link. Further, contrary to the defendant's assertion, there was never any real argument by the prosecutor that Carter's only source of information could have been his nephews. While the defendant argues that the prosecutor finished his closing argument making that point, a review of the closing argument reveals that this was not the case. Under the circumstances, it cannot be said that the trial court abused its discretion in denying the motion for continuance.

## Ineffective Assistance of Counsel

The defendant argues his trial counsel, Mark Sachse, provided ineffective representation. The defendant alleges that his counsel failed to interview and call certain witnesses to confer with him in any reasonable way prior to trial, to make an opening statement, and to file any pretrial motions. Further, the defendant argues Sachse elicited potentially incriminating statements on cross-examination, and failed to properly object to closing arguments or the treatment of jury questions.

We have held that before counsel's assistance is determined to be so defective as to require reversal of a conviction, a defendant must establish: (1) Counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived the defendant of a fair trial. *State v. Sperry*, 267 Kan. 287, 297, 978 P.2d 933 (1999). Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. There is a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance. 267 Kan. at 298. To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. 267 Kan. at 298. The performance and prejudice prongs of the ineffective assistance of counsel inquiry are mixed questions of law and fact, requiring de novo review. 267 Kan. at 297.

The defendant complains that Sachse should have called Della Betts, Lori Betts, Norma Meeks, Clintel Betts, Robert Law, Detective Golubskie, Andrea Burdette, and Dave Thomas to testify on his behalf. The defendant claims Della Betts would have testified that Carter told her he had no knowledge of the murder. However, Sachse explained that Della's testimony would have been undercut by her problems with the legal system and her obvious bias against Carter. The defendant stated at the hearing that Lori Betts would testify Carter told him he was asleep at the time of the shooting and saw nothing. It is difficult to see what this testimony would have accomplished as Carter told the police the same story. The defendant argues that Norma Meeks would have possibly testified that Carter told her he lied to the police. This might possibly have been helpful but there is no testimony as to why this was or was not done.

The defendant in his brief claims Clintel Betts, the defendant's uncle, would have testified he saw the shooters running in a different direction than reported by Alfred Burdette. However, there is no support for that statement in the record, and the defendant made no such claim at his hearing on his motion for ineffective assistance. The defendant did claim Clintel would testify Carter told him Celester and Dwayne were asleep when the shots were fired. This might be somewhat helpful except Carter made the same claim to police at first. Further, Sachse explained that Clintel did not want to testify, thus, reducing his effectiveness as a witness.

The defendant argued that Robert Law would have testified that Spencer had been given information by the police about the crime,

and that Spencer had shot at the defendant's house. However, Law's testimony would have been suspect because he was charged with capital murder at the time of trial. In any event, Sachse did not remember ever being told about Law by either the defendant or his family. The defendant also stated that he wanted to call Detective Golubskie to testify as to what was said to Spencer. However, the import of this testimony would have been negligible where the prosecution did not take the position that the only way Carter could have learned about the crime was through his nephews.

The defendant wanted to call Andrea Burdette to testify that her father was drunk and could not have witnessed all that he testified to. If true, however, this testimony would have seriously compromised Sachse's trial strategy which sought to push the blame for the crimes onto Celester and Dwayne.

While the defendant stated he wanted Dave Thomas, his employer, to testify as a character witness and possibly to testify as to the defendant's demeanor the day after the murder, it is difficult to see how this would have added to the defendant's case.

The defendant claimed his trial counsel failed to communicate with him in a meaningful manner and that counsel would not return his telephone calls, answer his letters, tell him the strategy, or prepare him to testify. However, Sachse testified he visited with the defendant on approximately three occasions and also communicated extensively through the defendant's family. Sachse also testified that he made the defendant fully aware of the trial strategy.

The defendant also complained of the failure to make an opening statement. However, Sachse explained that in a case where the witnesses might change their testimony, he preferred not to give an opening statement.

The defendant contended that Sachse failed to file motions in limine or discovery motions. However, he fails to specify what motions should have been filed or what a discovery motion would have accomplished in view of the prosecutor's open file available to Sachse.

The defendant also contends that Sachse elicited incriminating evidence from Carter during his cross-examination at the suppres-

sion hearing on Carter's testimony. During cross-examination, Sachse attacked Carter's credibility by questioning his story that Greg was killed because he broke into the defendant's apartment. Sachse stated: "Okay. You're telling us Les told you that the reason Brian killed Greg is because Greg broke into Brian's apartment, right?" Carter replied: "Brian also said that." Sachse then stated: "I understand, but that's the reason you're telling the Court because he broke into this apartment?" Sachse then went on to attack Carter's credibility, highlighting the fact that prior to the murder the defendant was of the opinion that Celester was the person who broke into the apartment. The defendant argues that before Sachse elicited the information, there was no testimony connecting him to the crime. This is false in that Carter had already testified that the defendant told him he stood over Greg and finished him off. Any argument that Sachse's questioning somehow damaged the defendant is specious.

The defendant also complains that Sachse tried to elicit testimony from Carter at the suppression hearing that Celester and Dwayne's mother thought her sons were involved in the murder. Even if this occurred, it would have been in line with the theory of the defense which was to put the blame on Celester and Dwayne rather than the defendant.

The defendant also argued that his counsel erred in failing to object to his lack of presence when the trial court was communicating to the jury and for failing to object to the substance of the communications. We conclude in this opinion that the defendant's absence when the trial court communicated with the jury was error. However, we also concluded that the error was harmless. Thus, we are confident that counsel's failure was not so serious as to deprive the defendant of a fair trial.

Where experienced attorneys may disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective assistance of counsel. *Crease v. State*, 252 Kan. 326, 338, 845 P.2d 27 (1993). The majority of the defendant's allegations concern Sachse's reasonable trial strategy. Others allegations of error concern disputed facts. Viewing the representation as a whole, we conclude the defendant has failed to overcome the pre-

sumption that his trial counsel's performance was effective. As a result, the trial court did not err in failing to order a new trial based on ineffective assistance of counsel.

## Presence of the Defendant for Jury Question

The defendant next complains that the trial court failed to follow the proper procedure in responding to questions from the jury. He argues: (1) The trial court improperly communicated with the jury outside his presence, (2) the trial court also improperly answered the questions asked by the jury, and (3) the trial court failed to read back testimony requested by the jury.

K.S.A. 2000 Supp. 22-3405, as well as the Sixth Amendment Confrontation Clause and the Fourteenth Amendment Due Process Clause of the United States Constitution, require the defendant's presence at every critical stage of a trial, including whenever the trial court communicates with the jury. *State v. Bell*, 266 Kan. 896, 919-20, 975 P.2d 239 (1999). Similarly, K.S.A. 22-3420(3) requires that once a jury has begun deliberations, any questions concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is voluntarily absent. 266 Kan. at 919.

In the case at hand, the jury asked eight questions of the trial court during deliberations. The record does not reflect the presence of the defendant when five of those questions were answered. The defendant was present for three of the answers. In its decision on the motion for a new trial, the trial court noted the defendant was present for any read-back of testimony but conceded the defendant might not have been present on the other instances such as when the court clarified the jury's question. Where the record does not affirmatively reflect the presence of the defendant, this court will presume that the defendant's constitutional right to be present was violated and that K.S.A. 22-3420(3) was not followed. *State v. Bell*, 266 Kan. at 920. However, as we recognized in *Bell*, a finding of a constitutional violation does not end the inquiry because a violation of the right to be present is subject to the harmless error rule. 266 Kan. at 920. Thus, the error will be declared harm-

less if this court concludes that the error had little, if any, likelihood of having changed the result of the trial. 266 Kan. at 920.

In order to determine whether the error was harmless, the substance of the responses must be analyzed. It should be noted that the defendant's counsel testified that he actually suggested the answers given. Normally, of course, a litigant is not allowed to lead a trial court into error and then complain of the trial court's action on appeal. *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999). However, the defendant's right to counsel is a personal right to be present and it is possible that his wishes might have been different than that of counsel. Further, the substance of the responses was part of the defendant's claim that his trial counsel was ineffective. As a result, it is incumbent upon this court to review the responses for prejudice.

The defendant asserts that two of the responses caused him prejudice. One of the questions asked by the jury was:

"We would like to hear the testimony regarding whose entrance the hooded individual entered in the rear of the house. Carter's & Brian's mother."

After conferring with counsel, the trial court sent the following reply:

"There was no testimony as to whose entrance the hooded individual entered in the rear of the house."

The jury was obviously concerned as to whether the person seen by Alfred Burdette entered the entrance to the defendant's apartment. The jury's question asked for testimony from Carter and the defendant's mother regarding this subject. The defendant's mother testified: "[T]he back apartment is where Brian was living. The entrances that lead to the main area of the house, but it's completely separate living quarters." Carter testified the defendant's apartment had a separate entrance on the Greeley side, while there was also a side entrance on the other side of the house. Carter also testified that there was no back entrance per se because both the defendant's entrance and the side entrance were on the sides of the house.

The jury then asked a followup question to the trial court's response:

"There were three entrances described on the house. We need clarification on whose and what doors went to which tenant and where the doors were located. Carter's Testimony."

The trial court answered:

"There was testimony presented that the door on the front of the house facing 5th Street was to the main portion of the house. There was no testimony presented as to which portion of the house each of the doors entered."

The defendant argued that the trial court's blanket answer did not reflect the complete nature of the testimony at trial. He contends his mother's testimony explained the placement and should have been read. However, the defendant's mother's testimony did not answer the jury's question as to whose entrance at the back of the house the individual was alleged to have entered. In fact, the testimony placed the defendant's residence at the back of the house, which would lead to the inference that it was the defendant's residence the individual entered.

The defendant argues that the court should have read Alfred Burdette's testimony regarding the placement of entrances. However, the jury did not ask for this testimony but, instead, asked only for Carter's testimony.

Finally, the defendant alleges that the trial court should have read Carter's testimony rather than summarizing it. He argues that under K.S.A. 22-3420(3), the trial court is allowed only to read back or exhibit the evidence, not to summarize it. He alleges that if the testimony had been read, the jury might well have divined the information they were seeking in a manner favorable to him.

K.S.A. 22-3420(3) does not authorize a trial judge to summarize testimony but, rather, only to read it back if available. However, it is difficult to see how that summary affected the substance of the testimony. At best, the summarized testimony was favorable to the defendant. Under the circumstances, the failure to read back the testimony and the failure to have the defendant present during the communication with the jury did not affect the result of the trial.

The defendant also complained of the trial court's answer to a question which occurred when he was present. The jury sent out the following question:

"Request of Testimony (complete), Mr. Burdette, Mr. Carter Betts, Brian's Mother. May we have complete testimony of the above three witnesses?"

The trial court addressed the jury and stated that it could not provide it with a transcript of the testimony but that general areas of the testimony could be provided and read back. The jury conferred and requested the testimony of Burdette explaining his view of the shooting, which was then read back to the jury. The jury foreman stated the read-back answered the question.

The defendant contends the trial court should have read back the entire testimony of the witnesses. However, we have held that the trial court has the discretion to control the read-back and to clarify the jury's read-back request if the read-back request is unclear or too broad, or if the read-back would jeopardize the manageability of the trial. *State v. Myers*, 255 Kan. 3, 8, 872 P.2d 236 (1994). The trial judge did just that in asking the jury to pick out general areas of the testimony to be read back. The jury picked an area, the testimony was read back, and the jury foreman indicated that the read-back answered the question. Under the circumstances, asking the jury to pick out general areas of the testimony to be read back was a reasonable response and was not an abuse of discretion.

## *Batson* Objection

The defendant's final contention is that the trial court erred in overruling his *Batson* objection to the prosecutor's peremptory strikes of black jury members. See *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 St. Ct. 1712 (1986). The defendant objected after the prosecutor used his peremptory strikes to remove seven of the eleven African Americans on the 36 member jury panel and also the only Hispanic juror. The trial court ruled that the defendant had made out a prima facie case of discrimination, thus required the prosecutor to give race-neutral reasons for the strike. The prosecutor gave the following race-neutral reasons:

1. Juror Berry—Indicated that he knew the Betts family and they have mutual relatives.
2. Juror Officer—Was 15 minutes late coming back from lunch.

3. Juror Slay—Indicated that he had served on a civil jury that was deadlocked and unable to reach a verdict.
4. Juror Gordon—Her boyfriend had previously been charged with murder.
5. Juror Camacho—Youthful in appearance and maturity.
6. Juror Harrington—Knew the Betts family. Also was unemployed.
7. Juror Cowan—Middle aged man who had been working on the job for only 1 year and did not feel he was stable person.
8. Juror Jackson—Very pregnant and dressed inappropriately.
9. Juror McField—Knew all of the Betts family.

After the prosecutor gave his purported race-neutral reasons, the trial court heard argument from the parties on the subject of pretext and ultimately concluded the *Batson* challenge should be denied.

In *Batson*, 476 U.S. at 89, the United States Supreme Court held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of race or on the assumption that the jurors of that race as a group will be unable to impartially consider the case. See *State v. Walston*, 256 Kan. 372, 377, 886 P.2d 349 (1994). In order to challenge the striking of a venireperson under the *Batson* methodology, the defendant must first make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. If such a showing is made, the burden then shifts to the State to articulate a race-neutral reason for striking the venireperson in question. The court must then determine whether the defendant has carried the burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991); *State v. Harris*, 259 Kan. 689, 704-05, 915 P.2d 758 (1996).

All agree that the defendant set out a prima facie case and the prosecutor articulated race-neutral reasons for the strikes. The defendant argues the trial court erred in finding the prosecutor's race-neutral reasons were not a mere pretext for purposeful discrimination. The standard of review to be applied when analyzing a district court's ruling that the State did or did not act with discrim-

inatory purpose in exercising its peremptory strike is whether the court abused its discretion. *Harris*, 259 Kan. at 705; *Walston*, 256 Kan. at 373-74. Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the district court. 256 Kan. at 374.

The defendant contended the prosecutor struck Juror Cowan, a black man, because he was middle-aged and had only been working at his job for 1 year, but failed to strike Juror Laughery, a white woman, who exhibited the same characteristics. The record reveals that Juror Cowan was married with three children, aged 28, 27, and 21, and that he was a janitor for the school district and had been on the job approximately 1 year. Juror Laughery, who was not struck, was divorced, with two children, aged 31 and 21, and was a customer service representative for Montgomery Wards and had been on the job for 1 year. The State argues in its brief that Laughery cannot be compared with Cowan because Laughery was a more attractive juror for the State in that she had someone close to her who had been murdered. The problem with the State's argument was that this distinction was not made at the time of the strike.

We have held that the fact the State strikes a minority juror but fails to strike a white juror with similar characteristics is circumstantial evidence of purposeful discrimination. *State v. Lee*, 263 Kan. 97, 112-13, 948 P.2d 641 (1997). However, while this kind of circumstantial evidence may be sufficient to prove that the State's race-neutral reason was pretextual, it cannot be considered conclusive evidence in each case as a matter of law. The trial court's finding ultimately hinges on the court's evaluation of the prosecutor's credibility, which is entitled to great deference upon appellate review. 263 Kan. at 113.

This strike is troubling and the trial court made no lengthy analysis of the fact there might have been other white jurors with the same characteristics as the struck juror. On the other hand, the prosecutor in this case did not use his peremptory strikes to remove all African-Americans from the jury panel, although he could have done so. A factor to be considered in determining whether strikes

are discriminatory is the presence of other members of the same minority on the jury and the failure of the State to remove such members when given the opportunity. *State v. Kingsley*, 252 Kan. 761, 779, 851 P.2d 370 (1993). The race-neutral reasons given by the prosecutor for the other strikes are facially reasonable.

The United States Supreme Court noted in *Hernandez* that on the often dispositive question of whether the State's strikes were a pretext for discrimination:

"There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " 500 U.S. at 365.

The trial court in the case at hand concluded the prosecutor's race-neutral reasons were valid. This is not a conclusion with which no reasonable person would agree and, therefore, under our standard, we conclude that the trial court did not abuse its discretion.

Affirmed.