No. 89,204

STATE OF KANSAS, *Appellee,* v. REGINALD MEEKS, *Appellant.*

(88 P.3d 789)

Opinion filed April 23, 2004.

*Sandra Carr,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Kristen Chowning-Martin,* assistant district attorney, argued the cause, and *Phill Kline,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Reginald Meeks appeals his conviction for the first-degree premeditated murder of James Green. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the trial court commit error in allowing the admission of the victim's statement, "Meeks shot me?" No.

2. Did the trial court abuse its discretion in denying defendant's request for a continuance? No.
3. Did the trial court abuse its discretion in permitting the jury to hear the entire recording of the 911 call? No.
4. Did the cumulative effect of trial errors deny the defendant a fair trial? No.
5. Did sufficient evidence establish that the murder was premeditated? Yes.

Accordingly, we affirm.

## FACTS

At 9 p.m. on August 21, 2001, the decedent, James Green, his brother Imon (a/k/a Shawn) Wright, Mia Taylor, and Dennis Jennings (a/k/a Rusty) were with Christopher Graves at his home at 647 Troup in Kansas City, Kansas. The defendant, Reginald Meeks, who was a friend of Christopher Graves' brother Jesse, came to the Graves house and demanded an apology from Green regarding a prior incident where Green had shut Meeks' hand in a door. Green refused to apologize.

Meeks challenged Green to fight outside, and Green reluctantly agreed. Meeks went outside first, followed by Green and the others. Green and Meeks fought and wrestled for about 5 minutes. Green then stopped, telling Meeks that he was tired and that they did not need to fight.

Green's brother, Wright, testified that Meeks continued trying to get to Green, so Wright stepped in to calm Meeks down. As Green was walking away toward his home at 648 Troup, Meeks pulled out a handgun. As everyone scattered, Wright warned Green that Meeks had a gun. Meeks began chasing Green around Wright's car, which was parked on the street.

When Green slipped and fell, Wright threw a brick toward Meeks. Meeks turned and aimed his handgun at Wright, so Wright ran to 647 Troup. As Wright reached the door, he heard two gunshots. After he went inside the house and shut the door, he looked back into the street. He saw his brother, Green, lying on the ground and Meeks standing in front of Green. Meeks then ran away with the gun in his hand.

The other people present testified to similar events. Taylor testified that as Green got up and started to walk away from the fight, Meeks followed him and pulled out a gun. When someone yelled that Meeks had a gun, Green turned around and then began running around Wright's car. Meeks fired several shots, Green fell down, and Meeks ran away.

Jennings testified that after Meeks and Green were wrestling, Meeks pulled out a gun and fired. When Jennings heard the first shot, he ran to his house with Graves.

Wright, Taylor, and Graves were later shown photographic lineups; each one separately identified Meeks as the shooter.

Around 9 p.m., Reverend Lacy Rydell, a neighbor, heard two gunshots and heard Green cry for help. Rydell went to the door and saw Green stooped down in the street behind a car. Rydell then called 911. He saw Green fall to the ground and the other man shoot at Green and then run. Rydell heard five to six gunshots in all.

Two other people in the neighborhood also heard the shots that evening and saw Green running around a car. Barbara Ann Brooks, Green's girlfriend, was at 648 Troup. She testified that when she heard gunshots, she ran to the door and saw a guy chasing Green around the car and shooting him. Cassie Glover, who lived at 650 Troup, heard five or six gunshots and went to her door. She saw Green running around a car, but saw no one else. After running upstairs to lay her stepdaughter down, she returned and saw Green lying on the street.

Officer Terrance Hall was the first police officer to arrive at the scene, appearing approximately 10 minutes after the shooting. He asked Green who shot him, and Green answered, "Meeks shot me." By 9:22 p.m. Green was unconscious; at 10:47 p.m. he was pronounced dead. The coroner found one gunshot wound in the chest from a .25 caliber bullet which missed Green's right lung but pierced his left lung and one of the major veins that drains blood from the arm. He also found several small abrasions. He opined that based upon Green's wound, Green could have remained conscious for 10 to 15 minutes after being shot.

Detective Terry Zeigler spoke with Meeks on August 27, 2001, 6 days after Green's death. Meeks waived his *Miranda* rights and told Zeigler that he was with his mother at her house at 9 o'clock the night of Green's death. However, his mother, Esther Hawkins, later testified that she worked from 3 p.m until 11 p.m. that night, that she got home from work around 11:15 p.m., and that she saw Meeks coming down the street. He stayed for only a few minutes.

Despite what Meeks had initially told Detective Ziegler about being with his mother at her house at 9 o'clock the night of Green's death, his theory of defense at the trial was that he was at the Club Uptown that night, not wrestling and shooting Green on Troup. As support, his sister, Ra'meka Meeks, testified that when she was still 19 years old, she went to the Club Uptown with Reginald Meeks, Jason Meeks, and a friend named Mike one weeknight sometime around August 2001. The defendant then testified that the night they had gone to that club was Tuesday, August 21.

However, Norma Harris, the manager and owner of Club Uptown, testified as a State rebuttal witness that her club was only open Thursdays through Saturdays before August 28, 2001. She also testified that the club's video system, which through its video tape might confirm or deny Meeks' defense that he was present, was not in place until the end of January 2002. She also provided summaries of liquor purchases during various months in an attempt to corroborate her testimony that the club was not open on the night of the murder.

The jury convicted Meeks of first-degree premeditated murder, and the court sentenced him to life, without eligibility for parole for 25 years.

## ANALYSIS

Issue 1: *Did the trial court err in allowing the admission of Green's statement, "Meeks shot me?"*

Meeks claims that the trial court abused its discretion in admitting Green's statement, "Meeks shot me," because the statement lacked adequate indicia of reliability, thus violating his Sixth Amendment right to confront the witnesses against him.

The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her. As acknowledged by the parties in their briefs and oral arguments, however, this constitutional provision does not preclude the admission of all out-of-court statements. See *State v. Sanders*, 258 Kan. 409, 417-18, 904 P.2d 951 (1995). As this court stated 6 years ago in *State v. Bailey*, 263 Kan. 685, 692-93, 952 P.2d 1289 (1998) (quoting *State v. Bratt*, 250 Kan. 264, Syl. ¶ 1, 824 P.2d 983 [1992]):

" 'The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. *Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception.* If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness.' " (Emphasis added.)

Consistent with this guidance in *Bailey,* the trial court allowed the admission of Green's statement into evidence under K.S.A. 2003 Supp. 60-460(d)(3). That statutory hearsay exception requires that the declarant be unavailable and the statement be made at a time when the declarant had recently perceived the matter, while the declarant's recollection was clear, and that the statement was made in good faith prior to the commencement of the action and with no incentive to falsify or distort.

That ruling is now suspect, however, because in an opinion filed on March 8, 2004, approximately 6 weeks after oral arguments in the instant case, the United States Supreme Court substantially altered the Confrontation Clause analysis expressed in *Bailey* which was in large part based upon *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Court drew distinctions between testimonial and nontestimonial hearsay evidence. It held:

"Where *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where *testimonial* evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; *and to police interrogations."* (Emphasis added.) 541 U.S. at 68.

In short, the Court held that witnesses' out-of-court statements that are testimonial are barred under the Confrontation Clause unless (1) the witnesses are unavailable and (2) the defendants had prior opportunity to cross-examine those witnesses. In other words, the *Roberts* standards of admissibility, as used by this court in *Bailey,* could not apply to testimonial statements, with the possible exception of testimonial dying declarations. *Crawford,* 541 U.S. at 56 n.6.

In the instant case, Officer Hall was arguably conducting an interrogation when he asked Green if he knew who shot him, thus making the response testimonial. Moreover, Meeks was not given the opportunity to confront Green through cross-examination because Green died before testifying at trial. We need not determine whether the response was testimonial or not, however, because we hold that Meeks forfeited his right to confrontation by killing the witness, Green.

In *Crawford,* the Court stated that it continued to accept the rule of forfeiture by wrongdoing which "extinguishes confrontation claims on essentially equitable grounds." 541 U.S. at 62 (citing *Reynolds v. United States,* 98 U.S. 145, 158-59, 25 L. Ed. 244 [1879]). As the *Reynolds* Court stated:

"The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own [the accused's] wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is

supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." 98 U.S. at 158.

In *State v. Gettings*, 244 Kan. 236, 769 P.2d 25 (1989), the Kansas Supreme Court addressed an appellant's argument that in his trial for burglary and aggravated arson, admission of a statement by a deceased was improper because it violated his right to confrontation and because it was hearsay. The court rejected his argument, holding that the defendant waived his right to confrontation because he was involved in procuring the absence of the murdered witness. Citing *United States v. Thevis*, 665 F.2d 616, 630 (5th Cir. 1982), *cert. denied* 459 U.S. 825 (1982), we stated: " '[W]hen confrontation becomes impossible due to the actions of the very person who would assert the right, logic dictates that the right has been waived. The law simply cannot countenance a defendant deriving benefits from murdering the chief witness against him.' " 244 Kan. at 239.

We went on to hold that by adopting the reasoning of *Thevis* and others, a waiver of the right to confrontation based upon the procurement of the absence of the witness also constitutes a waiver of any hearsay objections to prior statements of the absent witness. We also held that where waiver by misconduct is an issue, the burden of proving that the defendant procured the absence of the witness is upon the State by a preponderance of the evidence. 244 Kan. at 240.

Although *Gettings* involved somewhat different facts from those of the instant case, in an *amicus* brief filed in *Crawford* by law professors Clark, Duane, Friedman, Garland, Maveal, McCormack, Moran, Mueller, and Park in support of petitioner, the professors addressed our specific situation:

"If the trial court determines as a threshold matter that the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, *even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable*. Just as in *Bourjaily*, bootstrapping does not pose a genuine problem. See Richard D. Friedman, *Confrontation and the Definition of Chutzpa*, 31 Israel L. Rev. 506 (1997)." (Emphasis added.) Brief, p. 24 n.16.

In the instant case, the trial court, with *Bailey* as its pre-*Crawford* guide, did not specifically "[determine] as a threshold matter that the reason the victim [Green] cannot testify at trial is that the accused [Meeks] murdered" him, because the State did not present that narrow issue for determination. Our review of the transcript of the hearing on the State's motion to admit Green's statements, however, reveals that the court did consider Green had been shot in the chest from a range of 4 to 6 feet; that Green was dead; and that at least four witnesses were present when Green told the officer, "Meeks shot me." Scant evidence was presented to the contrary. We therefore hold that the issue is proven by a preponderance of the evidence.

Meeks forfeited his right of confrontation and waived any hearsay objections. Green's statement was properly admitted.

Issue 2: *Did the trial court abuse its discretion in denying defendant's request for a continuance?*

In the trial of a criminal case, the matter of a continuance is within the discretion of the trial court and its ruling will not be disturbed unless such discretion has been abused and the substantial rights of the defendant have been prejudiced. *State v. Stallings*, 262 Kan. 721, 726, 942 P.2d 11 (1997). Discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Bey*, 270 Kan. 544, 546, 17 P.3d 322 (2001). The burden of proof is on the party alleging the discretion is abused. *Bey*, 270 Kan. at 546.

Meeks' theory of defense was that he was at Club Uptown on Tuesday August 21, 2001, the night Green was murdered. Norma Harris, the club manager and owner, testified as a State rebuttal witness that the club was not open that night and its video system was not in place until the end of January 2002. She also provided summaries of liquor purchases in an attempt to corroborate her testimony that the club was not open that night.

Meeks' attorney cross-examined Harris about the video system, business records, and evidence that people under 21 have been allowed into the club in the past. Although the record is not clear, it appears when counsel had earlier requested the videotape of that

night from the club to confirm or deny Meeks' presence, he had not been informed that the system was not in place, but that the video tape had been "taped over," leading him to conclude the club had been open.

After Harris' testimony, Meeks' attorney therefore requested a continuance to "look into this surprise information, get records, speak to police officers involved in these other cases I know about to establish that the cameras were [at the Club Uptown] on August 21st."

The Court replied:

"Mr. D'Arcy, I'm going to deny that request. I think we're awfully far afield right now from what the issue in this case is. And whether we're going to litigate how much liquor she was buying at any particular time and whether or not there were cameras there or not is just too peripheral to the issues in this case I believe and so your request for a continuance would be denied."

On appeal, Meeks claims that the failure to grant the continuance to allow him to seek support for his alibi deprived him of a fair trial. He argues that he did not know what Harris' testimony would be until the morning she actually testified.

Meeks cites *State v. Betts*, 272 Kan. 369, 33 P.3d 575 (2001). In *Betts*, however, this court found no abuse of discretion in the trial court's denying a continuance to investigate allegedly exculpatory evidence. Betts requested a continuance to interview a detective who was alleged to have told the victim's family about weapons involved in the crime, hoping to use the information to rebut the State's contention that because Betts' uncle knew which weapons were used in the crime, he must have received the information from someone associated with the crime. 272 Kan. at 386-87. This court found that the materiality of the evidence was doubtful and that any investigation would "necessarily be a fishing expedition to try to establish a link." 272 Kan. at 387.

Although Meeks may not have been on notice that his alibi would be rebutted so strongly, he was able to cross-examine Harris. Additionally, if his alibi were true, Meeks certainly would have been able to subpoena club workers and patrons who were at the club on August 21, 2001,— especially Jason Meeks and a friend named Mike, whom his sister testified had accompanied them on an Au-

gust weeknight — to bolster his alibi by testifying in his case in chief. Whether such witnesses could have been found and so testify, however, is in doubt when at least three eyewitnesses identified Meeks as fighting Green and then shooting him to death on Troup Street at the time he claimed to be in the club. Moreover, the defense still would have had to contend with the fact his first alibi, that he was at home with his mother, had already been shaken by her testimony.

Meeks fails to meet his burden of proving abuse of discretion. We cannot say that no reasonable person would take the view adopted by the trial court. We therefore need not reach the issue of whether the district court's denial of the continuance prejudiced Meeks' substantial rights.

Issue 3: *Did the trial court abuse its discretion in permitting the jury to hear the entire recording of the 911 call?*

Meeks claims that it was error for the trial court to play the entire recording of a 911 call made by Lacy Rydell during the shooting because the prejudicial impact of the recording substantially outweighed the probative value.

Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. *State v. Dreiling,* 274 Kan. 518, 549, 54 P.3d 475 (2002); see also *State v. Kingsley,* 252 Kan. 761, 770, 851 P.2d 370 (1993)(noting that despite the wording of K.S.A. 60-445, the element of surprise does not get factored into the equation).

Our standard of review of otherwise relevant evidence which arguably should have been excluded after this particular weighing is abuse of discretion. *Kingsley,* 252 Kan. at 770. As mentioned, discretion is abused only when no reasonable person would take the view adopted by the trial court; the burden of proof is on the party alleging that the discretion is abused. See *Bey,* 270 Kan. at 546.

Defense counsel objected to the portion of the tape in which crying could be heard, arguing that there are statements by un-

known declarants and that it was cumulative and unduly prejudicial. The State responded that the tape corroborated Rydell's testimony that he called 911 as he was viewing the incident; that it corroborated testimony by Mia Taylor and Green's brother, Shawn Imon Wright, about the commotion at the scene; and that it gave insight as to the medical status of Green after the shooting.

The court ruled:

"Well, I have also listened to that tape and the portion that Mr. D'Arcy is concerned about. I think we've listened to that perhaps three times and I certainly am not able to discern any words that are actually being spoken and I don't believe that there's anything there that is unfairly prejudicial to the defendant in that regard.

"Mr. D'Arcy, I know that you're concerned that perhaps someone is speaking your client's name. I think that that is probably a stretch and I think it would take somebody with ears the size of an elephant to hear what's being said there and to discern any individual words. It's primarily screaming and hollering and yelling. I think that that exhibit probably conveys what was going on at the scene at that moment probably better than any testimony that's being recalled after the fact. And so, Mr. D'Arcy, your objection to that tape after 50 seconds is overruled."

In *State v. Williams*, 235 Kan. 485, 681 P.2d 660 (1984), this court upheld the admission of a 911 tape that recorded conversations, screams, and other noises heard by the dispatcher for 30 minutes during the victim's rape. The defendant argued that the recording was so gruesome that it was more prejudicial than probative. We found that the argument was without merit.

"The recording went to the very heart of the case showing the victim's lack of consent, that her resistance was overcome by force or fear, and that the sexual assault occurred. The tape also corroborates the testimony of several witnesses, including the victim. The tape is not inadmissible because it is gruesome and shocking. It is a true reproduction of a gruesome, shocking event. The fact the recording reflects this may not be used by appellant to exclude such evidence as 'prejudicial.' It was prejudicial as is all evidence against the accused in criminal actions. That is its purpose. It is only when such prejudicial evidence has little probative value that it is excluded. Here its probative value was strong. The tape recording was properly admitted." 235 Kan. at 493.

Similarly, in *State v. Abu-Fakher*, 274 Kan. 584, 56 P.3d 166 (2002), this court upheld the admission of an audiotape made by the defendant that recorded the events occurring before, during, and after the moment he shot his wife. The defendant sought to

exclude the portion of the tape containing his wife's dying moans and gasps. This court first looked at whether the recording was inadmissible and then whether it would tend to prejudice the jury. We concluded:

"[T]he trial court correctly determined that the probative value of the recording as a whole outweighed any prejudicial impact created as a result of the dying sounds of [the wife]. As in *Williams*, the recording captured a shocking, gruesome event; however, the probative value of the recording is strong. The tape recording captured the demeanor of the parties involved and changes in the demeanor of [the defendant] and [his wife] before, during, and after the shooting. In addition, the recording not only corroborates the testimony of [the defendant] and [a witness] concerning their telephone conversation, but provides evidence of the nature and duration of their exchange. The recording is the most probative and comprehensive evidence of the actual commission of the crime, the sequence in which events occurred, and their duration; it provides considerable context for the manner of death and time span in which the events took place." 274 Kan. at 598.

The tape in the instant case contains relevant evidence. As the district court ruled, it "probably conveys what was going on at the scene at that moment probably better than any testimony that's being recalled after the fact." Moreover, the tape corroborates the testimony of several witnesses, particularly about the victim's condition after the shooting. Meeks fails to meet his burden of demonstrating that the court's admission of this evidence, after weighing the probative value against the prejudicial, was an abuse of discretion. Specifically, we cannot say that no reasonable person would take the view adopted by the trial court. See *Bey*, 270 Kan. at 546; *Kingsley*, 252 Kan. at 770.

Since *Crawford v. Washington* had not been released at the time of oral arguments, we acknowledge that on appeal Meeks may not have raised a Confrontation Clause argument because of prior case law, *i.e.*, *Ohio v. Roberts* and *State v. Bailey*. Nonetheless, our review of the 4-minute recording against this new backdrop essentially supports the admission of this evidence. Even if we assume (but do not decide) much of the recording is testimonial because the 911 operator was affiliated with law enforcement and was therefore "interrogating" Rydell, there is no Confrontation Clause

violation: the few voices which were intelligible belong to witnesses who testified at trial.

Green himself can be heard at least twice responding to Rydell's questions — as requested by the 911 operator — about whether Green can move his legs (yes) and about whether he can breathe all right (no). As explained in issue 1 regarding the "Meeks shot me" statement, however, Meeks forfeited his right to confrontation and waived his right to object on hearsay grounds once he killed the declarant, Green.

Issue 4: *Did the cumulative effect of trial errors deny the defendant a fair trial?*

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' *State v Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992)." *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

Meeks claims that the admission of the statement "Meeks shot me;" the admission of the recording of the 911 call; and the refusal to grant a continuance to investigate alibi evidence were errors that collectively denied him a fair trial. The State argues that the evidence was overwhelming against Meeks and that there were no trial errors to accumulate.

The trial court did not commit the errors alleged by Meeks. Without error, there can be no cumulative error.

Issue 5: *Was there sufficient evidence that the murder was premeditated?*

"Our standard of review, when sufficiency of the evidence is the issue, is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, this court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Decker*, 275 Kan. 502, 505, 66 P.3d 915 (2003).

As we stated in *State v. Saleem*, 267 Kan. 100, 104, 977 P.2d 921 (1999): " '[p]remeditation is the process of simply thinking

about a proposed killing before engaging in the homicidal conduct.' " While premeditation may be established by circumstantial evidence, it may not be inferred merely by the use of a deadly weapon alone.

" 'Circumstances which may give rise to the inference of premeditation include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.' " *State v. Murillo,* 269 Kan. 281, 286, 7 P.3d 264 (2000) (quoting *State v. Cravatt,* 267 Kan. 314, 328-29, 979 P.2d 679 [1999]).

Meeks contends that because he did not shoot Green on sight, but instead fought with him first, Meeks' possession of a gun did not show premeditation. Meeks also argues that premeditation is absent because it would not make sense to stage the murder in full view of the victim's friends and family so that he could be easily identified. Meeks points out that witnesses had seen him carrying a weapon before and that he did not continue to fire rounds into Green to ensure his death.

Here, the evidence most favorable to the prosecution is that Meeks sought out Green at another's house and insisted that they fight, which Green did reluctantly. After wrestling and fighting with Meeks for 5 minutes, Green stopped the fight, saying he was too tired and that they did not need to fight. As Green walked away, Meeks pursued him and pulled out a handgun, all without provocation. When Green's brother intervened by throwing a brick to distract Meeks, he pointed his handgun at Wright and then continued his pursuit of Green. Although Green sought refuge behind a car, Meeks chased him around the car while shooting approximately five to six times. When Green fell on the ground, Meeks finally and fatally shot him in the chest. Meeks then fled.

At least three witnesses observed not only the wrestling that immediately preceded the shooting, but also the fatal shooting itself. They identified Meeks as the antagonist in both.

The evidence presented at trial, in the light most favorable to the prosecution, was sufficient to establish premeditation.

Affirmed.