No. 88,977

STATE OF KANSAS, *Appellee*, v. MICHAEL E. SHELBY, *Appellant*.

(89 P.3d 558)

Opinion filed May 14, 2004.

*Michelle A. Davis*, assistant appellate defender, argued the cause, and *Kathryn B. Wall*, assistant appellate defender, was on the brief for appellant.

*Robert D. Hecht*, district attorney, argued the cause, and *Deborah L. Hughes*, assistant district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Michael Shelby appeals his jury conviction of first-degree premeditated murder in violation of K.S.A. 21-3401(a) and his sentence to life imprisonment with the possibility of parole after

25 years. He contends that the trial court committed reversible error by granting the prosecutor's motion for late endorsement of a critical witness and by admitting gruesome and shocking photographs of the victim at trial. We affirm.

The defendant was introduced to Stephanie Ward by Lamanzo Searcy, a friend of the defendant. The defendant and Searcy had been friends since childhood and remained friends until the incident giving rise to this case. Searcy was a drug user. Approximately 4 months prior to Ward's death, Ward agreed to allow the defendant to use her house to sell drugs in exchange for furnishing her drugs. Searcy was also provided with free drugs by the defendant for finding a home the defendant could use to sell drugs. Others also sold drugs out of Ward's home.

Because of the increased traffic, neighbors' complaints, and intense police surveillance of Ward's residence, a search warrant was issued for her Topeka residence. Officers discovered crack cocaine, powdered cocaine, marijuana, plastic baggies, and a set of scales. Ward and Eric Mims were arrested, but they bonded out of jail. Ward let it be known to Searcy that she was not going to take the rap for the drug bust, and if anything went down, she was going to tell everything. Searcy told the defendant later that day what Ward had said.

After the drug raid of Ward's home, the defendant asked Searcy to rent a motel room for him. Searcy went to a motel at 37th and Topeka Boulevard with Robert Chitwood, who paid for the room. Although he could not remember specific dates, Chitwood recalled renting the motel room for the defendant sometime before Ward's murder.

When Searcy and Chitwood returned to the defendant's house, the defendant was having a telephone conversation with Ward. Searcy heard the defendant tell Ward not to worry and that if she went to jail he would get her out. The defendant hung up and told Searcy that it had been Ward on the telephone and that she did get raided. Chitwood gave the defendant the keys to the motel room, the defendant gave Searcy drugs, and Searcy went home. Searcy lived with Janice Brooks (Searcy—now his wife) and her

three children. Janice's son, Monta Brooks, lived at a group home but occasionally was allowed a pass for home visitations.

Key testimony at trial was provided by Searcy, who agreed to testify against the defendant in exchange for the State's dismissal of his pending charges of felony possession of a firearm and aiding a felon after the fact. The agreement provided that Searcy would not be given immunity if he perjured himself or if he was involved in any homicide or murder.

Ward's friend Janice Shinn visited her at Ward's home between 9:30 and 10 p.m. on Friday, May 25, 2001. Shinn tried to call a few times later that evening beginning around 11 p.m., but Ward did not answer.

Searcy testified that later that Friday night, around 10 or 10:30, the defendant came to his house and asked if he could get a ride to the motel room. Janice Brooks initially did not want them to take her car but relented when the defendant gave her $20. Searcy could smell the odor of a "wet" from the defendant, which is a marijuana cigarette laced with another drug.

When they got into the car, Searcy saw that the defendant was holding a gun and the defendant said, "I had to do that bitch." Sometime later, the defendant said he "domed the bitch in the head." Searcy explained that "domed" meant shot or killed. Searcy later said the defendant's second statement was "I had to dome the bitch."

Searcy took the defendant to the same motel room that they had rented earlier. The defendant asked Searcy to clean his pistol while the defendant was in the shower, and the defendant put his clothes in a bag. The defendant jumped in and out of the shower to see what Searcy was doing, and Searcy felt as if he could not leave. However, the defendant then told Searcy to leave, dismantle and burn the gun, and burn the bag of clothes. Searcy went home, showed Brooks (his wife) the clothes and the gun, and they drove to a secluded spot to dump the clothes. Searcy kept one of the gloves that the defendant had been wearing to hold the gun and not get his fingerprints on it. They hid the gun in a safe before selling it to a person named Cain. Concerned that he was being

blamed for the murder, Searcy and his family went to Colorado where he was subsequently apprehended and returned to Kansas.

Brooks corroborated much of Searcy's testimony at trial: that the defendant came to their home around 11 p.m. on Friday asking for a ride, that Searcy returned with a bag of clothes and a gun, that she recognized a shoe in the bag as belonging to the defendant, that they dumped the clothes, and that they put the gun in the safe. She said that Searcy had told her that the defendant had killed someone.

After the discovery of Ward's body by her mother, Officer Jason Cooper responded to the call from Ward's house around 10 a.m. on Tuesday, May 29, 2001. Officer Cooper testified at trial that the photograph of Ward and the bedroom accurately depicted the crime scene he observed. The defense's objection to the admission of this photograph on the grounds that there was no question that Ward was killed in her home was overruled.

Officer Robert Youse, the officer in charge of the initial drug raid, testified that Ward's home was in the same condition as it was after the raid, with a lot of clothing on the floor, a bed mattress standing up on one end, and numerous drawers left open which had been searched. Officer Carl Larsen observed no sign of forced entry to either of the two entrances to the home. Although a shell casing is normally ejected when firing a 9 mm. gun, only one spent 9 mm. shell casing was found at the scene. A spiral notebook was found which contained the defendant's nickname, "Money Mike," and a telephone number.

Crime scene technician and latent fingerprint examiner John Sanders testified that the defendant's fingerprints were not found at the crime scene. On May 29, 2001, Brooks turned over a glove to the police which she claimed fell out of the bag into her trunk. Sanders indicated that if a person was wearing that particular glove no fingerprints would be left behind.

Brooks led a detective to the location where they had dumped the clothes, and the clothes were recovered. Kansas Bureau of Investigation (KBI) forensic scientists testified that a bloodstain was discovered on a shirt from this clothing; however, the DNA testing was inconclusive.

Police officers executed a search warrant at the defendant's home and recovered a 9 mm. magazine clip made by the same manufacturer as the gun that was used to kill Ward, and it was made to fit the same particular model of the gun. The live rounds in the clip were the same caliber and brand as the spent casing found at the scene. The gun had been recovered by the police and was identified as the defendant's gun.

The defendant was arrested on May 30, 2001, at the motel on Topeka Boulevard. Scott Tibbits testified that while he was in jail with the defendant, the defendant told him "[t]hat he turned her house into a crack house, and she got busted, and they—she said she was going to snitch on him, so he had to lay her down."

At trial, coroner and forensic pathologist Erik Mitchell testified that Ward was shot at relatively close range in the middle of the back of her head and on the left side of her head and that she died from these wounds. Mitchell opined that the level of decomposition at the May 29, 2001, autopsy was consistent with Ward having been shot on Friday, May 25, 2001. During his testimony, Mitchell utilized several photographs of the victim in explaining his testimony.

## Late Endorsement of Witness

The State and the defense had a report from Detective Kennedy which indicated, through a Kansas Children's Service League (KCSL) caseworker, Jan Weese, that Monta Brooks was on a 48-hour home pass from his group home from Thursday, May 24, 2001, to Saturday, May 26, 2001. This information, although later disproved, would have put Monta in Searcy's home the night of the killing. As such, both the prosecution and the defense extensively examined Searcy about when Monta was visiting, and the defense used this report to impeach Searcy's testimony. However, the prosecutor found out the day of trial that Weese no longer worked for the KCSL, and he issued a subpoena duces tecum for Monta's current caseworker, Marcy Scott. On a break after Searcy's testimony, the prosecutor discovered that Scott had provided a document which showed that Monta was actually given a 6-hour pass on May 26, 2001, from the group home, and he passed on

this information to the defense at the noon break. This information established that Monta was not at Searcy's home the night of the killing.

After recess, Shinn and Janice Brooks testified. Brooks indicated that the defendant had come to their house needing a ride on the night of Friday, May 25. Brooks testified that her son Monta was not in the home at the time because they picked him up from the group home the next day (Saturday) on a 1-day pass. At the conclusion of Brooks' testimony, the prosecutor moved for the court to endorse Marcy Scott of the KCSL.

The defendant objected because he had based his cross-examination of Searcy on the initial information that Monta was home the night of the killing. The defense argued that this information affected the manner in which it cross-examined Searcy on this issue earlier that morning. The district court responded that the defense could recall Searcy and granted the motion reasoning that the testimony was critical and relevant and was not prejudicial to the defendant.

Scott testified that she had been Monta's caseworker since February 15, 2002, the date that Weese left her employment with KCSL. She testified that Monta had a pass to visit his mother in Topeka from 1 to 7 p.m. on Saturday, May 26, 2001, and the district court admitted the record from the group home which reflected this information. On cross-examination, the defense pointed out that Weese had told Detective Kennedy that Monta had a pass from May 24 to May 26, but Scott indicated that she was unaware where Weese would have gotten that information because it was not in the file.

K.S.A. 2003 Supp. 22-3201(g) provides:

"Except as otherwise provided, the prosecuting attorney shall endorse the names of all witnesses known to the prosecuting attorney upon the complaint, information and indictment at the time of filing it. Except as otherwise provided, the prosecuting attorney may endorse on it the names of other witnesses that may afterward become known to the prosecuting attorney, at times that the court may by rule or otherwise prescribe. If any witness is to testify and the prosecuting attorney believes the witness who has provided information is in danger of intimidation or retaliation, the prosecuting attorney may delay identifying such informant witness until such informant witness actually testifies but in no event shall

identification of a witness be delayed beyond arraignment without further order of the court after hearing and an opportunity of the defendant to be heard."

The above statute confers broad discretionary power on the trial court in allowing a late endorsement of a witness. *State v. Martens*, 274 Kan. 459, 471, 54 P.3d 960 (2002). "An appellate court will generally uphold a late endorsement unless the defendant was surprised and the testimony was critical or, in other words, of 'a climactic and highly damaging nature.' [Citation omitted.]" *State v. Allen*, 21 Kan. App. 2d 811, 816, 908 P.2d 1324 (1995), *rev. denied* 259 Kan. 928 (1996). "Further, to sustain a claim of reversible error, a defendant must have objected to the late endorsement and must have been denied a request for a continuance of the trial. *State v. Beebe*, 244 Kan. 48, 52, 766 P.2d 158 (1988)." *State v. Bell*, 273 Kan. 49, 54, 41 P.3d 783 (2002).

However, this court has said that it will not condone surprise caused by the intentional withholding of the name of a witness as a part of the prosecution's trial strategy. *State v. Stafford*, 213 Kan. 152, 164, 515 P.2d 769 (1973), *modified* 213 Kan. 585, 518 P.2d 136 (1974). The purpose of the endorsement requirement is to prevent surprise to the defendant and to give the defendant an opportunity to interview and examine the witnesses for the prosecution in advance of trial. 213 Kan. at 164. "The trial court commits reversible error by allowing a late endorsement when such endorsement results in surprise or material prejudice to defendant, preventing 'a fair preparation of his defense.' *State v. Wilson & Wentworth*, 221 Kan. 359, 364-65, 559 P.2d 374 (1977)." *State v. Green*, 252 Kan. 548, 553-54, 847 P.2d 1208 (1993).

The State concedes and there is no question that the defendant was surprised by the late indorsement of Scott and her testimony from records of the KCSL. However, the nature of the evidence presented is another matter. The defendant argues that without Scott's testimony, the only information the jury would have was that the defendant came to the Searcy household on a night when Monta was definitely not at home. The evidence that defense counsel had before trial not only called into question the credibility of the State's key witness, who testified contrary to the evidence in

the police report, but it went to the heart of the defense that the defendant did not commit the crime by showing he was not there at the time alleged by Searcy and his wife.

The State argues that Scott's new information regarding the date of the pass was not climactic or highly damaging but, rather, went to the issue of Searcy's recollection of the collateral matter of which children were home the night the defendant came to the house wanting a ride to the motel. This information did not change the prosecution's theory of the case but merely bolstered it by corroborating Searcy's recollection that Monta was not home on a pass that night.

While the evidence was damaging to the defense, it did not rise to the level of being highly damaging or climactic for several reasons. See, *e.g.*, *Bell*, 273 Kan. at 54; (endorsement on second day of trial of witness who had conversation with and saw defendant burn bloody shirt not abuse of discretion when defense did not request continuance, had copy of witness' statement, and did not require change of trial strategy); *State v. Dupree*, No. 88,186, an unpublished Court of Appeals' opinion filed November 26, 2003, *rev. denied* 277 Kan. 926 (2004) (late endorsement of police officer who laid foundation for admission of victim's stolen jewelry found on defendant not climactic and highly damaging).

First, Searcy was not the only witness to testify about Monta's presence on the Friday night in question. Scott's testimony was cumulative in that it corroborated Brooks' testimony that Monta was not at their home on Friday evening when the defendant came to the house and they had picked up Monta for a 1-day pass on Saturday.

Second, although the defense argued it would have changed its trial strategy in cross-examining Searcy, it is likely that it would still have tried to impeach him. Searcy's initial testimony was that he recalled taking Monta back to the group home on Friday, which was contrary to both the initial evidence that Monta had a pass from Thursday through Saturday and the new evidence that he had only a 6-hour pass on Saturday. Although the defense was seeking to use Monta's presence in the home to pinpoint the exact date the defendant came to the Searcy home, it is important to note

that neither Searcy nor his wife ever wavered in stating that the defendant came to their home on Friday night. The only question in Searcy's mind was whether his stepson was at their home as well.

Third, the defense was given the opportunity to thoroughly cross-examine both Scott and Weese and it was able to highlight the inconsistencies between the dates Weese told Detective Kennedy the pass was issued and the new date presented through Scott's testimony and records at trial. This cross-examination permitted the defense to cast doubt on the reliability of the new information presented at trial, as well as Searcy's recollection of the events.

Fourth, it is unlikely that the defendant was materially prejudiced by the introduction of this evidence at trial in light of the overwhelming amount of circumstantial evidence presented in support of his guilt. Aside from Searcy's damaging testimony which was corroborated by Brooks, the defendant secured a motel room shortly before the incident, multiple witnesses indicated that Ward was planning on providing the police with information following the raid, she was last seen or heard from on Friday night, the bullets recovered from her head were fired from the gun Searcy sold after the shooting, a magazine clip which fit that gun was found in the defendant's home, and the defendant admitted to a cellmate that he "had to lay her down" because she was going to snitch.

Finally, the defendant failed to comply with our courts' traditional requirement that the defendant request and be denied a continuance in order to establish reversible error. See *Bell,* 273 Kan. at 54. For all of these reasons, the district court did not abuse its discretion in endorsing the late witness.

## Photographs

The defendant argues the district court abused its discretion by admitting seven gruesome and shocking photographs of Ward's body, which graphically showed the impact of the gunshot wounds to her head. He argues that these photographs were repetitious, had no probative value, and did not prove any contested elements of the offense.

The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable or, in other words, when no reasonable person would have taken the position that was taken by the trial court. *State v. Hebert*, 277 Kan. 61, Syl. ¶¶ 9, 10, 82 P.3d 470 (2004).

The defendant cites *State v. Gholston*, 272 Kan. 601, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002), in arguing that "[t]he real question regarding the admissibility of photographs should be whether the photographs prove an element of the offense that is contested and must be proved by the prosecutor beyond a reasonable doubt."

In *Gholston*, the trial court admitted photographs of a child victim in the hospital connected to life support with a blood-soaked bandage on her forehead and an autopsy photograph depicting the child's gunshot wound to the head. At trial, the defendant did not challenge the fact that the victim's death was caused by a gunshot wound and the sole issue raised was the identity of the shooter. The defense argued that the photographs were irrelevant and inflammatory because there was no disputed fact that the photographs tended to prove.

On appeal, this court recognized:

"It is well established that photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. *State v. Coyote*, 268 Kan. 726, 737-38, 1 P.3d 836 (2000).

"*Even where the defendant concedes the cause of death, the prosecutor has the burden to prove all the elements of the crime charged and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997)." (Emphasis added.) 272 Kan. at 613.

As the photographs illustrated the nature and extent of the wounds inflicted and the medical attention required after the victim was shot, corroborated the police officer's and the mother's testimony about the extent of the injuries, and corroborated the testimony of the officers who attended the autopsy, the district court did not

abuse its discretion in admitting the photographs. 272 Kan. at 613-14.

Applying *Gholston* to this case, all the photographs were admissible to corroborate the testimony of the officer as to Ward's condition when found and the testimony of the coroner that the victim was shot twice in the head at close range. Further, the photographs were relevant to proving the identity of the shooter, as the defendant told Searcy that he "domed the bitch in the head." This was an execution-style killing because Ward was going to inform the police of the defendant's drug activities.

The defendant further contends the only thing the State had to prove in this case in order to convict him was that he was the person who had committed the offense, and he argues that the admission of grisly photographs of the victim's body is error where "the cause of death of the victim was really not in dispute." *State v. Boyd,* 216 Kan. 373, 378, 532 P.2d 1064 (1975).

In *Boyd,* the defendant challenged the admission of 14 photographs of the deceased victim taken at the autopsy, arguing that they were repulsive, inflammatory, without probative value, and highly prejudicial. On appeal, this court concluded that one photograph which showed the body of the victim "cut open from chin to groin and laid out like a disemboweled beef in a packing plant" and "[a] flap of chest skin partially cover[ed] the deceased's face and the chest and abdominal organs of the deceased [were] presented in full view" was admitted for the sole purpose of inflaming the minds of the members of the jury. 216 Kan. at 377-78.

In reaching this decision, the court noted that the cause of death of the victim was not in dispute but some of the photographs were necessary to support the medical witness' testimony about the angle of the stab wounds. The court concluded that the trial court unnecessarily admitted repetitious exhibits to prove this same point, noting especially the photograph described above. 216 Kan. at 378.

The photographs in this case simply showed the position in which the body was found, the two separate gunshot wounds, and the stippling pattern on Ward's shoulder and clothing from being shot at close range. No more than two photographs of each were

shown to the jury. The coroner had not altered the body in any material way except for shaving Ward's hair around the entry wound to the back of the head, and no internal organs were depicted. Moreover, *Boyd* specifically noted that even though the cause of death was not in dispute, some of the photographs were relevant to corroborate and explain the medical witness' testimony. As previously discussed, the photographs in this case were necessary to corroborate the testimony of the officer and the coroner that Ward was shot twice in the head at close range. The district court did not abuse its discretion in admitting these photographs.

Affirmed.

NUSS, J.: Concurring. I write separately only to distinguish my analytical path from that of the majority opinion concerning our standard of review for the admission of the photographs. One who did not read the majority opinion's cited cases might conclude that the standard of review is entirely for abuse of discretion. In my opinion, review for abuse of discretion is the second step along the analytical path. The first step is to review for relevance.

As stated in the majority opinion:

"The defendant argues the district court abused its discretion by admitting seven gruesome and shocking photographs of Ward's body which graphically showed the impact of the gunshot wounds to her head. He argues that these photographs were repetitious, had no probative value, and did not prove any contested elements of the offense."

My analysis of these contentions begins with this court's statement in *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 (2004):

"Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as 'evidence having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. *State v. Dreiling*, 274 Kan. 518, 549, 54 P.3d 475 (2002); see also *State v. Kingsley*, 252 Kan. 761, 770, 851 P.2d 370 (1993) (noting that despite the wording of K.S.A. 60-445, the element of surprise does not get factored into the equation).

"Our standard of review of otherwise relevant evidence which arguably should have been excluded after this particular weighing is abuse of discretion. *Kingsley*, 252 Kan. at 770. As mentioned, discretion is abused only when no reasonable person would take the view adopted by the trial court; the burden of proof is on the party alleging that the discretion is abused. See *Bey*, 270 Kan. 546."

This two-step analytical path is recognized and codified in K.S.A. 60-445, discretion of judge to exclude admissible evidence. It states:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

As noted and as applied by this court in *State v. Kingsley*, 252 Kan. 761, 770, 851 P.2d 370 (1993), despite the wording of the statute, the element of surprise does not get factored into the equation (citing Comments, 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-445 [1979]). Among other times, the trial court also would have discretion to exclude otherwise relevant evidence if it is cumulative or repetitious. See *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975), as cited by the majority.

Based upon our defendant's own contentions, the court therefore first must have determined whether the photographs were relevant. I agree with the majority opinion that they were because, among other things, they:

"corroborate the testimony of the officer as to the condition Ward was found and the testimony of the coroner that the victim was shot twice in the head at close range. Further, the photographs were relevant to proving the identity of the shooter, as the defendant told Searcy that he 'domed the bitch in the head.' This was an execution style killing because Ward was going to inform the police of the defendant's drug activities."

The photographs also were relevant because, according to the majority opinion, they "showed the position in which the body was found, the two separate gunshot wounds, and the stippling effect on Ward's shoulder and clothing."

Having found as a threshold matter that the photographs were relevant, this court next must determine whether they should nevertheless have been excluded because they were repetitious or because their probative value was outweighed by the risk of unfair prejudice. I agree with the majority that, because not more than two photographs of each point depicted were shown to the jury, they were not repetitious. However, the majority did not address

what, in my view, is the defendant's remaining argument under the second step. Specifically, we must determine whether the prejudice inherent in the "gruesome and shocking photographs of Ward's body which graphically showed the impact of the gunshot wounds to her head" substantially outweighed their probative value.

Having examined the photographs, I cannot say that no reasonable person would have taken the view adopted by the trial court. See *Meeks*, 277 Kan. at 618. Because there was no abuse of discretion, I would, like the majority, therefore affirm the photographs' admission into evidence.

BEIER, J., joins in the foregoing concurring opinion.