NOT DESIGNATED FOR PUBLICATION

No. 116,901

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADLEY A. EMERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; NORBERT C. MAREK JR., judge. Opinion filed May 18, 2018. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and HEBERT, S.J.

PER CURIAM: A jury convicted Bradley A. Emerson of theft of a trailer. Two issues are rasied on this direct appeal: (1) whether the trial court erred in granting the State's late endorsement of an eyewitness on the day of trial and (2) whether the State committed reversible error when it introduced allegedly inadmissible evidence of a prior bad act. Emerson argues that these two issues require reversal of his conviction. Emerson's arguments, nevertheless, are not persuasive. Accordingly, we affirm.

1

On January 24, 2016, off-duty police officer, Officer Craig Pyle and his wife witnessed a Chevy truck driving away from the "Hiawatha Farm & Home, Steve's Tractor Repair, and John Deere area." These stores are all a part of Hiawatha Implement, a business that sells agricultural and utility vehicles and services. The truck was pulling a trailer, which was loaded with an implement attachment inside of it, even though Hiawatha Implement was closed that day. Thinking the activity was suspicious, Officer Pyle followed the truck. Eventually the truck pulled onto the highway and began accelerating to speeds that Officer Pyle did not feel comfortable with in his personal vehicle. As a result, Officer Pyle backed off from the chase and called the sheriff's deputy to report the suspicious activity. Before losing the truck, Officer Pyle took a picture of the truck and attached trailer.

A Hiawatha police investigator eventually obtained footage of two individuals coming out of a casino. He suspected the individuals of being involved in the incident at Hiawatha Implement. Officer Pyle identified the truck and the driver from the footage as being involved in the incident at Hiawatha Implement.

On February 1, 2016, Deputy Travis DeBarge was sent to Terri Comfort's property to investigate the case further. Upon arrival, Deputy DeBarge and another deputy on the scene identified the trailer by running the trailer's vehicle identification number (VIN). The trailer had damage to the axle and also had a wheel removed from it. After identifying the trailer, the deputies contacted Comfort who was present on the property. Comfort, who is Emerson's cousin, told the deputies that Emerson had placed the trailer on her property and removed the wheel in order to fix a problem with the trailer. The deputies showed a photo of the suspected vehicle, then asked her to identify the owner of the vehicle. Comfort told the deputies that it could be Emerson, but that it was hard to tell.

Harvey Halverson, Comfort's boyfriend, was also at Comfort's home on February 1 when the deputies questioned Comfort about the trailer. Although Halverson did not speak with the police that day, he contacted Deputy DeBarge several months later to arrange a meeting with him.

On February 12, 2016, the State charged Emerson with one count of felony theft. The trial court set trial for September 30, with an alternative jury trial date of November 3.

On September 26, 2016, only a few days before Emerson's trial, Halverson gave a statement to the police in which he alleged to have witnessed Emerson leaving the trailer on Comfort's property. Halverson further alleged that he had not reported the incident until days before trial because he was unaware of the proceedings and only learned of them when Comfort received a subpoena to testify at a pretrial hearing. Halverson also asserted that he did not contact police until months after the incident because he feared that going to the police would create relationship issues between Comfort and himself.

Emerson's trial was held on September 30, 2016. On the same day, the State moved to endorse Halverson as a witness. When the trial court acknowledged the motion to endorse Halverson, Emerson's defense counsel, Christopher Etzel, notified the trial court that he was unaware of the endorsement. The State tersely told Eztel: "[W]e faxed to your office 9-27[,] Mr. Halverson's statement." Etzel, nevertheless, maintained that he had not received any statement made by Halverson. Etzel objected to the endorsement on the grounds that he had not seen Halverson's statement and even if he had, it would have only been three days before trial. The trial court reserved the issue of endorsement until Etzel had the chance to read the statement, and the judge told the parties that the issue would be discussed again before Halverson was called as a witness.

3

After reading Halverson's statement, Etzel made another objection to the endorsement, stating:

> "Miss Comfort most certainly did not testify that she saw [Emerson] bring the trailer onto the property. . . So this is not a witness that's going to corroborate what Miss Comfort said. . . .
>
> "The second thing is, even if this came across the fax and I had it in my hands on the 27th, I'd still be jumping up and down objecting, because this changes everything in the case. . . . I would have probably asked for a continuance, because that changes everything, Judge. This isn't a circumstantial case any more. Now there's an eyewitness who's squarely pointing the finger at my client. That's a completely different strategy and potential research about him and his relationship to everyone involved, including Miss Comfort, including my client, which I haven't had time to explore. It's unduly prejudicial."

After listening to Etzel's objection, the trial court granted the endorsement. In granting the endorsement, the court stated: "[T]his witness contacted the [S]tate. Once he did that, [the prosecutor] was essentially under an obligation to obtain that testimony because it became *Brady* material immediately." The trial court then requested that the State not call Halverson as a witness until after the lunch break to give defense counsel some time to prepare for his testimony. Etzel did not then request a continuance of the trial but requested a 5-minute break to speak with Emerson about the statement. The trial court granted that request which resulted in an 11-minute recess.

The State called Art Vonderschmidt to testify first. Vonderschmidt testified that he was a consumer products salesman at Hiawatha Implement when the incident occurred. He further testified that a trailer with a "skid steer blade" in it had been taken from the business without permission. He also testified that the value of the trailer was around $2,000. After being shown the picture that Officer Pyle took the day of the incident,

4

Vonderschmidt identified the trailer in the picture as the one taken from his business and testified that he was unfamiliar with the vehicle driving away with it.

Officer Pyle testified next. He explained that before the incident at Hiawatha Implement, he had been notified by people working at Hiawatha Implement that a "suspicious individual or individuals . . . [were] hanging around, coming in, asking questions about keys and stuff like that." As a result, when he witnessed a truck driving around the business with a trailer and implement attachment on a day when the business was closed, Officer Pyle became suspicious. Officer Pyle thought the person in the vehicle was stealing the trailer and implement attachment. He followed the driver in his personal vehicle and took a picture of the truck and trailer. Eventually, Pyle called the sheriff's department to report the suspicious activity and discontinued his chase. In describing the driver of the vehicle to police, Pyle testified he told the police that there were two males in the truck and that the driver was "kind of like a 45 year old . . . blondish hair, ball cap." On cross-examination, Pyle testified that he was able to see the driver sufficiently to identify that he was a male but was not able to identify whether the passenger was male or female. Pyle also explained that he identified the truck and driver from the video footage of the truck at a casino.

Deputy DeBarge was sent to Comfort's property in search of the stolen property and Emerson, the prime suspect in the case. Deputy DeBarge testified that the trailer was in plain view on Comfort's property. He and another officer further identified the trailer as the stolen trailer in question by checking the trailer's VIN. After verifying that it was the correct trailer, the officers contacted Comfort to question her about the trailer and Emerson. Comfort explained that Emerson was not on the property and had not been there for a couple of days. Comfort also told the officers that Emerson had left the trailer on the property.

Almost eight months after the police investigation at Comfort's home, Halverson contacted the county attorney's office claiming to have information about the stolen trailer. Deputy DeBarge called Halverson on September 26, 2016, to investigate the issue further. Halverson told DeBarge that he witnessed Emerson bring the trailer to Comfort's property on February 1, the same day officers went to Comfort's home to investigate the matter. Halverson did not give DeBarge a reason for waiting to come to the police about the information, nor the time of day in which he witnessed Emerson drop the trailer off. DeBarge also testified that he was familiar with Comfort and her property because he had responded to the property in the past for various warrants and miscellaneous calls. DeBarge, nevertheless, did not know Halverson before contacting him in relation to this case.

At trial, Comfort testified that Emerson was the person who left the trailer on her property. On cross-examination, Comfort explained that she was not sure and did not see that it was Emerson who left the trailer on her property, only that she assumed it was. On redirect examination, she testified that she thought Emerson had left the trailer on her property, "[b]ecause there was no one else that would have brought it." Comfort, reading from her testimony at the preliminary hearing, testified that "[Emerson] told me [the trailer] needed some work on it . . . he was going to take it, it needed a ball bearing or something to do with the wheels, and they were going to fix it and then get it off the property."

Comfort testified that it could have been a man named Cliff Swarthout, her family's handyman, who left the trailer on her property because he too lived there sometimes. Swarthout also owned various Chevy trucks. In addition to Swarthout, Comfort's roommate Debbie Guerrero, Comfort's boyfriend Halverson, and Comfort's cousin Emerson all lived in Comfort's home. Comfort testified that she did not want all of these people living in her home, but denied asking Emerson for help in getting these people to move out.

Halverson was called as the State's last witness. He testified that he was still living with Comfort in her home. Halverson further testified that he was at Comfort's home when Emerson dropped the trailer off on Comfort's property. Halverson told the jury that Emerson was by himself when he dropped off the trailer and was driving a "late model black or dark blue either Chevy or a GMC truck." Halverson identified the truck from the picture taken by Officer Pyle as Emerson's truck. He then explained that he thought that "a week or so" had passed between when the trailer was dropped off on the property and when the police arrived to investigate the case. When questioned about his statement, in which Halverson claimed Emerson had dropped the vehicle off on the same day police arrived to investigate, Halverson testified that Deputy DeBarge had given him that date and that February 1 was not the accurate date when the trailer was dropped off at Comfort's home.

Halverson explained that he was on Comfort's property when the police first arrived on February 1 inquiring about the trailer, and that he knew that was the reason police were there but that he did not speak with them. Halverson also explained that he had gone to the police only days before trial because he was unaware of the proceedings until Comfort attended preliminary hearings, a few weeks before trial. Halverson also told the jury that he was in the courtroom when Comfort first gave her testimony regarding the stolen trailer on September 8 but still did not make a statement of his own until September 26. After being pressed multiple times as to why Halverson waited so long to give a statement to police, he answered:  "Well, because I figured that this was—this would break [Comfort] and I up, and it probably will."

Halverson described Swarthout as "a low life that worked on [Comfort]'s house from time to time and lived in [Comfort's] house from time to time. . . . I think he had a light blue either Chevy or GMC truck that was half primer, half paint." Though Halverson wasn't sure, he testified that the personal property that had been placed in the

7

trailer after it was dropped off at Comfort's home belonged to Swarthout. Halverson also testified that he witnessed Swarthout covering the trailer and the property in the trailer with a tarp.

After Halverson's testimony, the trial court granted Etzel an additional 15 minutes to talk over Halverson's testimony with Emerson, after which Emerson was called to testify.

Emerson testified that Comfort told him that she was having relationship problems with Halverson. Comfort told Emerson that Halverson had problems with other people living in Comfort's home with them. Comfort then asked Emerson to help her in getting some of the people in her home to move out to mend her relationship with Halverson. Emerson told Comfort that he would help her. Emerson testified that he was helping Swarthout to fix the trailer to get it off of Comfort's property, which would ultimately help Swarthout to move out of Comfort's house. Emerson testified that he brought a wheel bearing to Swarthout in an attempt to fix the trailer on January 25 or 26. After dropping off the bearing, he simply left. When asked why Emerson believed Halverson testified as seeing Emerson drop off the trailer, Emerson stated: "It's my belief that he's disgruntled that anybody hangs around [Comfort] at all, family, friends, or otherwise, and to that end, he'll do what he needs to do. What he feels like he needs to do." Emerson testified that he had nothing to do with taking or transporting the trailer. When shown Officer Pyle's photo, Emerson identified the truck in the picture as Swarthout's vehicle.

The jury reached a verdict after roughly 30 minutes of deliberation. The jury found Emerson guilty of theft of property valued at $2,000.

Emerson was sentenced to 13 months in prison and 12 months' postrelease supervision, with his sentence running consecutive to his other sentences. The trial court

noted that Emerson was being given the aggravated term of prison because of the many thefts he had committed before this case.

*Did the Trial Court Err in Allowing the Late Endorsement of the State's Witness?*

K.S.A. 22-3201(g) requires the endorsement of the names of all witnesses known to the prosecuting attorney. The statute confers trial courts with broad discretionary power to allow a late endorsement of a witness. *State v. Shelby*, 277 Kan. 668, 674, 89 P.3d 558 (2004). "The purpose of the endorsement requirement is to prevent surprise to the defendant and to give the defendant an opportunity to interview and examine the witnesses for the prosecution in advance of trial." 277 Kan. at 674 (citing *State v. Stafford*, 213 Kan. 152, 164, 515 P.2d 769 [1973], *modified* 213 Kan. 585, 518 P.2d 136 [1974]).

This court reviews a trial court's decision to allow a late endorsement under an abuse of discretion standard. *State v. Snow*, 282 Kan. 323, 335, 144 P.3d 729 (2006), *disapproved of on other grounds by State v. Guder*, 293 Kan. 763, 267 P.3d 751 (2012); *State v. Bryant*, 227 Kan. 385, 387, 607 P.2d 66 1980). "An appellate court will generally uphold a late endorsement unless the defendant was surprised and the testimony was critical or, in other words, of 'a climactic and highly damaging nature.' [Citation omitted.]" *Shelby*, 277 Kan. at 674.

Emerson argues that the late endorsement of Halverson as a witness requires reversal of his conviction because Emerson was given inadequate time to prepare for the testimony and because Halverson's testimony was climactic and highly damaging to Emerson's case. Emerson, nevertheless, is not entitled to reversal because given Emerson's relationship with Halverson, he was given adequate time to prepare for Halverson's testimony, and the testimony did not require Emerson to change his defense

9

strategy. Also, Emerson failed to request a continuance, though the record reflects a knowledge of the ability to do so.

Emerson was not given time to interview Halverson before he testified, but Emerson knew Halverson for roughly 18 to 20 months before the case began and was given time to prepare for his testimony. Given his relationship with Halverson, Emerson was not put in a position to combat testimony from a total stranger but instead, was likely able to prepare for Halverson's testimony with greater efficiency.

Also, the statement Halverson provided to the police was short and put Emerson on notice of exactly what Halverson would testify to. Emerson and his defense counsel were given time to review the short statement and were also given time to meet with each other to discuss the statement, Halverson, and Emerson's relationship with Halverson. After their discussion, Emerson also told the jury that Halverson was a disgruntled man who would do almost anything to keep Comfort away from friends and family. Additionally, Emerson testified that he did not participate in the theft. Taking Emerson's testimony in consideration, the jury, nevertheless, took only 30 minutes to find Emerson guilty of theft.

In his argument, Emerson points to the timing of Halverson's statement to police. He argues that because Halverson was present in Comfort's home on February 1 when police first interviewed Comfort, he should have been questioned about his knowledge of the event then, which would have presented the State with ample opportunity to endorse the witness earlier. This issue, however, does not relate to the endorsement of Halverson as a witness, but instead, speaks to the credibility of Halverson's testimony. Emerson's defense at trial was that he simply did not commit theft. Though Halverson's testimony was contrary to that defense, the testimony did not negate his defense entirely. Instead, Emerson would simply need to attack Halverson's credibility, which he did. Emerson was able to cross-examine Halverson and call the jury's attention to Halverson's questionable

10

credibility. Consequently, the timing of Halverson's involvement in the case was flushed out during cross-examination and does not affect the analysis of Halverson's endorsement.

"[T]o sustain a claim of reversible error, a defendant must have objected to the late endorsement and must have been denied a request for a continuance of the trial." *Shelby*, 277 Kan. at 674. Emerson objected to the late endorsement of Halverson but failed to move for a continuance after the trial court overruled his objection.

After being given time to read the statement that Halverson had provided to police, Emerson's defense counsel adamantly objected to the late endorsement of Halverson as a witness. Defense counsel went on to tell the court that, "even if th[e statement] came across the fax and I had it in my hands on the 27th, I'd still be jumping up and down objecting, because this changes everything in the case. . . . I would have probably asked for a continuance, because that changes everything, Judge." Etzel's statement suggests that he knew a continuance could be requested but still did not request it. Thus, for whatever the reason, Emerson failed to request a continuance as required.

Emerson was given adequate time to prepare for Halverson's testimony and did not request a continuance. Emerson therefore fails to provide this court with proof of prejudice to his case. Consequently, Emerson's request for reversal should be denied.

*Did the State Present Inadmissible Evidence of a Prior Bad Act?*

Emerson argues that reversible error was committed when the State produced evidence of other crimes or bad acts by presenting evidence of the implement attachment, while Emerson was charged with stealing only the trailer. Emerson asserts that "[b]ecause the error compromised Emerson's constitutional rights to due process and a fair trial, this court must apply the *Chapman* test to determine whether the error is harmless." See

11

*Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). Emerson, nevertheless, failed to make a contemporaneous objection at trial and has, therefore, failed to preserve the issue for appeal.

"K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error *at trial.*" (Emphasis added.) *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). This court is duty bound to follow our Supreme Court precedent, absent some indication that our Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). There is no indication our Supreme Court is departing from *King*. See *State v. Solis*, 305 Kan. 55, 62, 378 P.3d 532 (2016) (applying *King*). Additionally, our Supreme Court in *Solis* held that the defendant's claim that an evidentiary error constituted a due process violation did not qualify as an exception to the rule outlined in *King*. 305 Kan. at 64. Solis' evidentiary error claim was still unreviewable due to his failure to object to the evidence at trial. 305 Kan. at 64. Thus, even if Emerson's claim implicates due process, his failure to lodge a contemporaneous objection precludes appellate review.

Affirmed.

12