IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 7, 2006

## STATE OF TENNESSEE v. JUDGE BROOKS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08238     Joseph B. Dailey, Judge**

---

**No. W2004-02834-CCA-R3-CD  - Filed August 31, 2006**

---

A Shelby County Criminal Court jury convicted the appellant, Judge Brooks, of first degree premeditated murder, and the trial court sentenced him to life imprisonment. In this appeal, the appellant claims (1) that the trial court improperly admitted the victim's prior statements into evidence under the hearsay rule's forfeiture by wrongdoing exception, Tennessee Rule of Evidence 804(b)(6), and in violation of the Confrontation Clause; (2) that the trial court erred by admitting evidence of the appellant's prior assault on the victim pursuant to Tennessee Rule of Evidence 404(b); and (3) that the evidence is insufficient to support the conviction. While we conclude that the trial court improperly admitted hearsay into evidence, we conclude that the error was harmless and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JOSEPH M. TIPTON, J., filed a concurring and dissenting opinion.

Garland Erguden and Robert Wilson Jones (on appeal) and Tim Albers and Donna Armstard (at trial), Memphis, Tennessee, for the appellant, Judge Brooks.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant beat his girlfriend, Deborah Chance, to death on July 20 or 21, 2003. Harlie E. Smith, the victim's uncle, testified that he lived in Springfield, Tennessee and that the victim telephoned him from Memphis on Saturday, July 19, 2003. The victim told Smith that she and the appellant were having a lot of problems and that she did not know how to get out of the relationship

or what to do. She said that the appellant had been accusing her of "running around with other men," and Smith told her to leave the appellant and come to Springfield. About 6:00 p.m. the next day, the victim telephoned Smith again. She sounded upset and told Smith that the appellant had been beating her all day, that she was afraid of him, and that she wanted to get away. Smith offered to drive to Memphis to pick up the victim, but the victim said she was going to try to sneak away and come to Springfield. Smith heard a man's voice in the background. The man said that the victim was not going anywhere, that she was his bitch and his whore, and that he was going to kill her. Smith had never met the appellant before, but the victim told Smith that the man was the appellant. The appellant wanted to speak with Smith, but Smith refused to talk to him. Smith said that in May 2003, the victim had telephoned him and told him that she was coming to Springfield because the appellant had beaten her. He said that when the victim arrived at his home, her eyes were bruised, the side of her head was swollen, she had bruises all over her arms, and some of her hair had been pulled out. The victim told Smith that the appellant had caused her injuries.

On cross-examination, Smith testified that while the victim visited him in May 2003, she drank beer but was not drunk. The victim had a good job in Memphis and wanted to return to it. During Smith's July 19 telephone conversation with the victim, the victim did not sound drunk and said that she loved the appellant but needed to get away from him. During Smith's July 20 telephone conversation with the victim, the victim asked him to telephone the police and send them to Texas Street. The victim told Smith that she would "try to have [the appellant] there because she had a warrant on him." Smith did not call the police but telephoned the victim's ex-boyfriend, who was familiar with the Memphis area, and asked him to call the police.

Officer Jeremy Wells of the Memphis Police Department testified that he was on patrol on July 21, 2003, and was dispatched to an apartment at 1290 Texas Street about 3:00 a.m. When he arrived, the appellant flagged him down and said that he had telephoned the police. The appellant was hysterical and told Officer Wells that his girlfriend was inside and might be dead. The appellant told the officer, "We got to fighting earlier, and I think I might have killed her." When backup officers arrived, Officer Wells patted down the appellant, handcuffed him, and put him in a patrol car. Officer Wells and some other officers went into the apartment, and Officer Wells saw a large amount of blood on the living room floor and walls. The appellant had told the officers that the victim was in the bathtub, and the officers found her dead there. Officer Wells noticed pieces of glass all over the apartment and called for an ambulance. On cross-examination, he testified that the appellant fully cooperated with him and was anxious for him to go into the apartment. He did not remember if he smelled alcohol on the appellant.

Memphis Police Officer David Galloway testified that he was dispatched to the scene. He saw blood spatter on the walls and blood on the living room floor, and the victim was lying face-down in the bathtub. He did not remember water being in the tub or the victim being wet. Officer Galloway photographed the scene and took measurements. He saw broken glass on the living room floor, a bloody pillow near the bedroom doorway, a bloody pillow in the kitchen doorway, a broken lamp in the kitchen trash can, and a bloody t-shirt on the living room couch. On cross-examination, Officer Galloway did not recall if beer bottles were in the trash can.

Melissa Horner of the Shelby County Criminal Court Clerk's Office testified that on May 16, 2003, the appellant had been charged with assaulting the victim. According to the victim's affidavit of complaint, the appellant hit the victim's face with his fist on May 10, 2003. He also stomped on her face and chest. The appellant's niece witnessed the assault and told the appellant to move away from the victim. Upon seeing a police car, the appellant fled the scene. In the affidavit, the victim stated that she received black eyes, a "busted" lip, knots to her face and head, and bruises on her body. The victim stated, "Due to this incident and prior attacks of violence, I [desire] to have no further contact with him."

Shereka Wright, an investigator with the Shelby County District Attorney's Domestic Violence Unit, testified that she took pictures of the victim on May 15, 2003. The victim was nervous, scared, and looked like she was about to cry.

Latisa Bridges, the appellant's niece, testified that the appellant was the victim's boyfriend and that the appellant and the victim lived together. One night in May 2003, the victim drove to Bridges' home. Bridges and the victim were going to a nightclub, but the victim told Bridges that she needed to give the appellant some keys. The victim and Bridges drove to Texas Street, and the appellant was standing outside in the rain. The victim got out of the car and gave him the keys, and the appellant walked away. The victim walked up behind the appellant and hit him on the back of the head. The appellant turned around and hit the victim with his open hand. The victim fought back and spit blood on him. The appellant hit the victim with an open hand again, and the victim scratched and fought him. The appellant kept telling the victim to leave, but the victim "proceeded to . . . edge it on more." The appellant hit the victim with his fist, knocked her down, and kicked her. Bridges got out of the car, grabbed the appellant, and said, "Don't do that." The appellant said, "Well get her and go. Tell her to leave me alone." Bridges put the victim in the car. She stated that a neighbor must have telephoned the police because the police arrived at the scene. However, the appellant had gone into the apartment and would not answer the door. Bridges stated that the victim had a "busted" lip, black eyes, and a knot over her right eye.

On cross-examination, Bridges testified that when the victim arrived at Bridges' home, the victim appeared fine but was drunk. After the victim gave the appellant the keys, the victim hit the appellant first, and the appellant smacked the victim's face. The appellant never threatened Bridges. When the police arrived at the Texas Street apartment, the victim told them that she did not want to press charges against the appellant because she loved him. About one or two months before the May 2003 assault, the appellant had left the victim and moved in with Bridges. During that time, the victim called the appellant's cellular telephone and Bridges' home constantly.

 Dr. O.C. Smith, the Shelby County Medical Examiner at the time of the victim's death, performed the victim's autopsy. He testified that the victim had bruises of varying ages on her arms and legs and recent bruises on her forehead, neck, and right wrist. Older bruises were mainly on the victim's arms and legs, and some of the bruises were more than forty-eight hours old. The victim also had patterned scrapes on her skin. One of the scrapes was under her left eyebrow, and another scrape was on the left side of her neck. Smith believed that an instrument, such as a knife with a serrated

edge, could have caused the scrapes. The victim had lacerations, which could have been caused by a fist, on the bridge of her nose and on either side of her nostrils. The victim's cheek and lip were bruised, the inside of her lip was bruised, and the inside of her mouth was torn. The victim's eyes were black, which could have resulted from blood pooling around the eyes and did not necessarily indicate that her eyes had been injured. The victim had a superficial "flick," which is a small wound made by the tip of a knife, below her left ear and a laceration behind that ear. Blood had collected under the victim's scalp, and she had bleeding to the surfaces of her brain. The victim died of brain swelling, and the pattern of injuries to the back of the victim's head indicated that she may have been struck multiple times with a shoe.

Dr. Smith testified that the victim was five feet, four inches tall and weighed one hundred fifty-six pounds. She had a blood alcohol content (BAC) of .244, and a person becomes under the influence of alcohol with a BAC of .05. The victim's clothes and head were wet, and water in her stomach indicated that she may have been underwater for some time. The victim suffered blunt trauma to the head, which injured the brain, and Dr. Smith concluded that a fall into the bathtub probably did not cause her head injuries or death.

On cross-examination, Dr. Smith testified that the chest, arms, hands, and legs are areas that a person commonly bruises during daily living. He said that some of the victim's bruises could have resulted from her falling down and that falling on a knife could have caused the scrapes and flick on her body. Dr. Smith classified the victim's BAC as "high," impairing her coordination and causing her to fall down. He said that the victim had cirrhosis of the liver and that people with liver damage are more likely to bleed and bruise. On redirect examination, Dr. Smith stated that the patterns of the victim's head injuries were consistent with an assault.

Jessie Mae Anderson testified for the appellant that she worked at the J&J Lounge in Memphis. The appellant and a woman came into the bar about 4:00 p.m. on Sunday, July 20, 2003. The appellant and the woman each drank a beer, but they were not drunk. The woman did not seem to have a problem with the appellant, and they did not fight. The couple left the bar between 7:00 and 9:00 p.m. On cross-examination, the State showed Anderson a photograph of the victim, and Anderson testified that the victim looked like the woman in the bar.

Mike Triplett of the general sessions criminal court clerk's office testified that the victim signed a petition for order of protection against the appellant on May 15, 2003. In the petition, the victim alleged that on May 10, 2003, the appellant hit her face with his fist and stomped on her face and chest. As a result of the petition, an order of protection was issued. However, the order of protection was dismissed on June 2, 2003, because the victim failed to appear in court and prosecute the case. On cross-examination, Triplett testified that on May 16, 2003, a warrant was issued for the appellant for assaulting the victim. According to the warrant, it was executed on July 22, 2003.

The appellant chose not to testify. Betty Zabt, the victim's aunt, testified on rebuttal that she had met the appellant previously, had talked with him, and would recognize his voice. In May 2003, the victim visited Zabt for a few days in Springfield, Tennessee. Clumps of the victim's hair were

missing, the victim's eyes were black, and she was bruised. Zabt heard the victim talk on the telephone with the appellant and heard the appellant say, "You bitch, I will kill you." On cross-examination, Zabt acknowledged that the appellant's threat frightened her and that she asked the victim not to return to Memphis. She told the victim that the appellant was going to kill her, but the victim wanted to return to Memphis because she did not want to lose her job. The jury convicted the appellant of first degree premeditated murder.

## II. Analysis

### A. Victim's Prior Statements

The appellant claims that the trial court improperly admitted into evidence statements the victim made to Harlie Smith in May 2003 about the source of her injuries and the victim's July 20 and 21 telephone conversations with Smith; the victim's May 2003 affidavit of complaint; and Latisa Bridges' testimony about the appellant's assaulting the victim in May 2003. He contends that all of the evidence was hearsay and inadmissible under the forfeiture by wrongdoing exception to the hearsay rule, Tennessee Rule of Evidence 804(b)(6). He also contends, without any discussion or analysis, that the evidence violated his constitutional right to confrontation. The State claims that, given the May 2003 assault case pending against the appellant at the time of the victim's death, the proof established that the appellant acted to procure the victim's unavailability as a witness against him and, therefore, that the victim's statements were admissible under the exception to the hearsay rule. The State also contends that the appellant has waived his claim regarding a Confrontation Clause violation because he murdered the victim. We agree with the appellant that the forfeiture by wrongdoing exception to the hearsay rule does not apply in this case. However, we conclude that the trial court's error in admitting the hearsay evidence was harmless. As to the appellant's claim that his confrontation rights were violated, we agree with the State that the appellant has waived this issue because he procured the victim's unavailability.

### 1. Hearsay

Before the State called its first witness, it told the trial court that the victim's uncle, Harlie Smith, would testify regarding his July 20 and 21 telephone conversations with the victim. Later, in a jury-out hearing, Smith testified about the conversations, and the defense argued that much of Smith's testimony was inadmissible hearsay. The State claimed that the evidence was admissible under the forfeiture by wrongdoing exception to the hearsay rule. The defense argued that the exception did not apply in this case because the State failed to present any proof that the appellant killed the victim in order to prevent her from testifying against him in the assault case. The trial court agreed with the State, stating that

> it would seem to be to me totally illogical, from a public-policy
> standpoint, to allow someone who procures the death of a witness to
> then benefit from the absence of that witness's testimony and whether
> one was able to demonstrate that that was the specific reason for

causing the death or not. And I just can't - and there's nothing of that sort that's mentioned in the commission comments at all. It simply says Rule 804(b)(6) adds a new hearsay exception.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. The "forfeiture by wrongdoing" exception allows the admission of a hearsay statement "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6) (emphasis added). "Even intentional misconduct, such as killing a witness, does not qualify unless done for the purpose of procuring the witness's unavailability." Neil P. Cohen, et al., Tennessee Law of Evidence § 8.39[2][c] (5th ed. 2005). In determining whether hearsay is admissible under the rule, the trial court must conduct a jury-out hearing and "find that a preponderance of the evidence establishes 1) that the defendant was involved in or responsible for procuring the unavailability of the declarant; and 2) that a defendant's actions were intended, at least in part, to procure the absence of the declarant." State v. Ivy, 188 S.W.3d 132, 147 (Tenn. 2006).

First, we must determine whether the statements at issue were hearsay. Smith's testimony about what the victim told him during their telephone conversations, the victim's statements to him about the May assault, and the victim's statements in her affidavit of complaint were hearsay pursuant to Tennessee Rule of Evidence 801(c). The pertinent part of Latisa Bridges' testimony, however, was not hearsay. Bridges' testimony focused on the May 2003 fight she witnessed between the victim and the appellant. She did not testify as to any statements made by the victim to the appellant during the altercation.

Next, we must determine whether any of the hearsay evidence was admissible under the forfeiture by wrongdoing exception. Our supreme court's recent analysis in Ivy is helpful. Like the appellant in the present case, David Ivy was frequently violent toward his girlfriend, LaKisha Thomas. In May 2001, Thomas called the police to her apartment and told the responding officer that Ivy had threatened to kill her because she wanted to end their relationship. Id. at 139. On June 6, 2001, another officer responded to a call and found the victim with a cut on her head, bruises on her chest, and a black eye. Id. Thomas told the officer that Ivy had attacked her and had threatened to kill her. Id. After the second incident, Thomas' cousins drove her to the police department, where she swore out a warrant against Ivy for assault. Id. En route to and from the criminal justice center, Thomas and her cousins saw Ivy following them. Id. at 140. After swearing out the warrant and leaving the justice center, Thomas and her cousins stopped at a liquor store, where Ivy approached Thomas and threatened to kill her if she "'put the police in his business.'" Id. Two days later, Ivy shot Thomas to death. Id. At trial, both of the officers who had responded to Thomas' calls testified that Thomas told them Ivy had threatened to kill her, and one of the officers testified about Thomas' physical injuries. Id. at 139. Thomas' relatives also testified that they saw Ivy pull Thomas' hair, that Thomas told them Ivy had kicked in her door and had broken her furniture, and that Thomas told them Ivy would allow her to leave her apartment for only one hour each day. Id. The trial court allowed the

hearsay testimony under Rule 804(b)(6). Id. at 146. The jury convicted Ivy of first degree premeditated murder and sentenced him to death.

On appeal, this court held that the proof did not establish by a preponderance of the evidence that Ivy acted with the intent to procure Thomas' unavailability as a witness. See State v. David Ivy, No. W2003-00786-CCA-R3-DD, 2004 Tenn. Crim. App. LEXIS 1154, at *40 (Jackson, Dec. 30, 2004). In reaching this conclusion, our court noted that the warrant for Ivy's arrest was not executed until after Thomas' death and that there was no evidence Ivy was even aware that a warrant had been issued. Id. Our supreme court, however, agreed with the trial court, stating,

> The preponderance of the evidence supported the trial court's finding that Ivy killed Thomas to prevent her from contacting police about his aggravated assault on June 6, 2001. Ivy followed Thomas as she drove to and from the Criminal Justice Center in Memphis, Tennessee, to swear out a warrant against him that was never served. He killed her only two days later. Given these facts, we disagree with the Court of Criminals Appeals' view that Rule 804(b)(6) required that Ivy had to know about the issuance of an arrest warrant for the aggravated assault; moreover, there was no requirement that Ivy's sole intention had to be preventing Thomas from testifying against him in a proceeding based on the aggravated assault.

Ivy, 188 S.W.3d at 147.

Turning to the instant case, we conclude that the preponderance of the evidence does not support a finding that the appellant killed the victim for the purpose of procuring her unavailability as a witness. The facts in the present case are significantly different from those in Ivy. Ivy followed Thomas to and from the police department and threatened to kill her if she "put the police in his business." The evidence in the present case, however, does not show that the appellant knew the victim had filed an affidavit of complaint or that a warrant had been issued against him. Although the police arrived at the appellant's apartment soon after the May 2003 assault, the victim told the officers that she did not want to press charges against him. Moreover, although the warrant was issued on May 16, 2003, it was not executed until July 22, 2003, one day after the victim's death. Finally, while Ivy killed the victim two days after Thomas swore out the warrant, the appellant and the victim in the present case continued to live together, and the appellant killed the victim more than two months after the warrant was issued. Given the facts of this case, we conclude that the victim's statements to her uncle and in her affidavit were not admissible under the forfeiture by wrongdoing exception.

Nevertheless, we hold that the trial court's error in admitting the hearsay evidence was harmless. Latisa Bridges testified as an eyewitness about the appellant's May 2003 assault on the victim, and Betty Zabt testified that she heard the appellant threaten to kill the victim. Although Zabt's testimony was hearsay, it was admissible pursuant to Tennessee Rule of Evidence 803(1.2) as

an admission by a party-opponent.[1]  Given the testimony of these two witnesses, Dr. Smith's testimony about the victim's injuries, the photographs depicting the victim's extensive injuries, and the appellant's admitting to Officer Wells that he fought with and possibly killed the victim, we conclude that the trial court's error did not affect the outcome of this case.  See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## 2.  Confrontation Clause

The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Likewise, Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face."  In Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), the Supreme Court examined the right to confrontation.  The court summarized the factual basis of the case by saying, "Petitioner . . . stabbed a man who allegedly tried to rape his wife, Sylvia.  At his trial, the State played for the jury Sylvia's tape-recorded statement to the police describing the stabbing, even though he had no opportunity for cross-examination."  541 U.S. at 38, 124 S. Ct. at 1356-57.  The court held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  Id. at 68, 127 S. Ct. at 1374.

In addition to this holding, the Supreme Court noted in Crawford that "[t]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds."  Id. at 62, 127 S. Ct. at 1370.  In other words, "if a witness is absent by [the defendant's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. . . .  The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong."  Reynolds v. United States, 98 U.S. 145, 158-59 (1879).  Arguably, the rule of forfeiture by wrongdoing should require a showing that the defendant killed the witness with the specific intent to prevent the witness from testifying, just as the forfeiture by wrongdoing exception to the hearsay rule requires.  However, the rule of forfeiture by wrongdoing with respect to the Confrontation Clause must be distinguished from the forfeiture by wrongdoing exception to the hearsay rule discussed previously.

The Sixth Circuit Court of Appeals made this distinction in United States v. Garcia-Meza, 403 F.3d 364 (6th Cir. 2005).  In that case, the defendant became angry and killed his wife after she danced with another man at a party.  Id. at 366-67.  Five months before her death, police officers had responded to an assault call and had found the victim beaten, frightened, and panicked.  Id. at 367. The victim told the officers that the defendant had punched her repeatedly and had threatened to kill her.  Id.  Evidence about the prior assault was admitted at trial, and, on appeal, the defendant argued that although the victim's statements about the assault were excited utterances, the statements were

---

[1]We note that although the appellant's telephone threat occurred two months before the killing, "remoteness affects only the weight, not the admissibility of the evidence."  State v. Smith, 868 S.W.2d 561, 575 (Tenn. 1993).

testimonial and violated his right to confrontation under Crawford. However, the Sixth Circuit held that the appellant was not entitled to relief under the Confrontation Clause, stating,

> We need not decide today . . . whether a victim's excited utterance made to an investigating police officer is testimonial, for the Defendant has forfeited his right to confront [the victim] because his wrongdoing is responsible for her unavailability. As noted above, in this case, defendant admitted that he killed [the victim], thereby procuring her unavailability to testify. The dispute at trial concerned not whether he was the one to stab her, but whether he acted with premeditation to support a conviction of first degree murder. Under these circumstances, there is no doubt that the Defendant is responsible for [the victim's] unavailability. Accordingly, he has forfeited his right to confront her.

Id. at 370 (citations omitted). Moreover, the Sixth Circuit specifically rejected the defendant's claim that the rule of forfeiture by wrongdoing required a showing that the defendant killed the victim with the specific intent to prevent her from testifying. As the Sixth Circuit explained,

> Though the Federal Rules of Evidence may contain such a requirement, see Fed. R. Evid. 804(b)(6), the right secured by the Sixth Amendment does not depend on, in the recent words of the Supreme Court, "the vagaries of the Rules of Evidence." Crawford, 124 S. Ct. at 1370. The Supreme Court's recent affirmation of the "essentially equitable grounds" for the rule of forfeiture strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive. The Defendant, regardless of whether he intended to prevent the witness from testifying against him or not, would benefit through his own wrongdoing if such a witness's statements could not be used against him, which the rule of forfeiture, based on principles of equity, does not permit.

Id. at 370-71. Other courts have also concluded that the forfeiture by wrongdoing exception to the Confrontation Clause does not require a showing that the defendant procured the witness's unavailability for the purpose of preventing the witness from testifying. People v. Bauder, 712 N.W.2d 506, 514-15 (Mich. App. 2005); see United States v. Mayhew, 380 F. Supp. 2d 961, 966-97 (S.D. Ohio 2004); People v. Moore, 117 P.3d 1, 5 (Colo. Ct. App. 2004); State v. Meeks, 88 P.3d 789, 794 (Kan. 2004); Commonwealth v. Mustafa Salaam, No. CR03-4624, 2004 Va. Cir. LEXIS 289, at **17-20 (Aug. 25, 2005).

Turning to the instant case, we initially note that most of the statements at issue are nontestimonial because the victim made them informally to family members. See State v. Maclin, 183 S.W.3d 335, 347 n.13 (Tenn. 2005). Therefore, they are not subject to the Confrontation Clause.

See Davis v. Washington, ___ U.S. ___, ___, 126 S. Ct. 2266, 2273-76 (2006). However, the victim's affidavit of complaint, which she made under oath before a judicial commissioner in general sessions court, is testimonial. Crawford, 541 U.S. at 51-52, 124 S. Ct. at 1364. Nevertheless, we are persuaded by the Sixth Circuit's reasoning in Garcia-Meza and conclude that, unlike the forfeiture by wrongdoing exception to the hearsay rule, a defendant's intent is irrelevant with respect to the forfeiture by wrongdoing exception to the Confrontation Clause when the defendant does not dispute that he procured the victim's unavailability. As this court has stated, "[t]he right of confrontation is not absolute and must occasionally give way to considerations of public policy and necessities of the case." State v. Kennedy, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999); see also Bourjaily v. United States, 483 U.S. 171, 182, 107 S. Ct. 2775, 2782 (1987) (stating that "[w]hile a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, this Court has rejected that view as 'unintended and too extreme'" (quoting Ohio v. Roberts, 448 U.S. 56, 63, 100 S. Ct. 2531, 2537 (1980))). We believe that the unique circumstances of this case require such considerations and conclude that the appellant has forfeited any Confrontation Clause claim regarding the victim's affidavit.

### B. 404(b) Evidence

The appellant also claims that evidence of his May 2003 assault on the victim was inadmissible pursuant to Tennessee Rule of Evidence 404(b) and that the probative value of the evidence was outweighed by the danger of unfair prejudice. The State claims that evidence about the appellant's prior assault on the victim was admissible to show the appellant's intent to harm the victim and to rebut any claim that the appellant accidentally killed her. We conclude that the trial court properly admitted the evidence.

In a jury-out hearing, the State argued that evidence of the appellant's May 2003 assault on the victim was admissible to show the appellant's intent and motive to hurt her on July 20. Specifically, the State argued that it should be allowed to present evidence of the prior assault through Latisa Bridges' testimony and the victim's affidavit of complaint. The appellant argued that the prejudicial effect of the evidence outweighed its probative value. The trial court agreed with the State, concluding that the evidence was admissible "to rebut any suggestion of mistake or accident or intent." The trial court also held that the evidence was "highly probative." During jury instructions, the trial court explained that the jury could consider evidence of the appellant's prior bad act only for the limited purpose of determining his identity, motive, or intent.

Tennessee Rule of Evidence 404 provides,

> (b) Other Crimes, Wrongs, or Acts.- Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

-10-

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. If the evidence is relevant, then, upon request, the court will proceed to a Rule 404(b) hearing.

In Smith, 868 S.W.2d at 574, our supreme court held that prior acts of violence and prior threats against a victim "are admissible under Rule 404(b) because the evidence is relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." See also State v. Turnbill, 640 S.W.2d 40, 47 (Tenn. Crim. App. 1982) (providing that the "prior relations between the victim and the appellant were relevant matters for the jury's consideration on the question of the appellant's intent"). In the instant case, the State had to prove that the appellant intended to kill the victim. See Tenn. Code Ann. § 39-13-202(a)(1). The trial court determined that the appellant's prior assault was relevant to establish his intent to kill her and properly instructed the jurors as to how they should consider this evidence. The trial court also determined that the evidence was "highly probative," demonstrating that it believed the probative value of the evidence was not outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion by allowing Bridges to testify about the appellant's prior assault on the victim. Although we concluded previously that the victim's affidavit of complaint was inadmissible hearsay, it was cumulative evidence, and any error in admitting the affidavit was harmless.

## C. Sufficiency of the Evidence

Finally, the appellant claims that the evidence is insufficient to support the conviction, arguing that there is no evidence of premeditation. In support of his argument, he notes that the victim was "falling down drunk," that she was found fully clothed in a bathtub, that a witness testified the victim and the appellant were not quarreling on the afternoon before her death, and that the bruises on her body "were of a pattern commonly seen in chronic alcoholics." The State contends that the evidence is sufficient for a rational jury to conclude that the appellant premeditated killing the victim. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellant was convicted of premeditated first degree murder, which is defined as "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner

of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; and (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

Viewed in the light most favorable to the State, the evidence establishes that the appellant and the victim had a volatile relationship. Although a witness testified that the appellant and the victim were in a bar on the night before the victim's death and were not fighting, the victim's uncle testified that he talked with her about 6:00 p.m. and that she sounded upset. The victim told her uncle that she was planning to leave the appellant, a possible motive for the killing. About nine hours later, the appellant flagged down a police officer, told the officer that he and the victim had been fighting, that he thought the victim was dead, and that he may have killed her. The autopsy photographs show that the appellant brutally beat the victim. Her forehead, cheeks, and lips were badly bruised, the skin on her nose and behind her ear was torn, her eyes were black, and she had bruises on her arms and legs. Dr. Smith testified that the victim's brain swelled due to bleeding on its surface and that the victim's injuries showed she had been assaulted. Dr. Smith also testified that a serrated knife may have caused some of the victim's injuries, indicating that the appellant used a weapon in his attack against her, and there is no evidence that the victim was armed. Betty Zabt testified that she heard the appellant say over the telephone that he was going to kill the victim. We conclude that a rational juror could have found that the appellant acted with premeditation. Thus, the evidence supports the appellant's conviction for first degree premeditated murder.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE